## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **JOHN DOE,** | |
| **Plaintiff,** | Civil Action No._____ |
| **v.** | **COMPLAINT** |
| **BOSTON UNIVERSITY and the TRUSTEES OF BOSTON UNIVERSITY,** | **JURY TRIAL DEMANDED** |
| **Defendants.** | |

Plaintiff John Doe ("Plaintiff" or "Dr. Doe"),[1] by and through his attorneys, Nesenoff & Miltenberg, LLP, as and for his Complaint against Defendants Boston University and the Trustees of Boston University (the "Trustees" or "Board of Trustees"), (together, the "University" or "Defendants" or "BU"), respectfully alleges as follows:

### THE NATURE OF THIS ACTION

1.      This case arises out of the actions and omissions of Defendants Boston University and the Trustees of Boston University, as well as their agents and employees, in connection with a biased, discriminatory, and procedurally flawed disciplinary proceeding against Plaintiff, and the resulting termination of Plaintiff's employment as a professor at BU's School of Medicine.

2.      Prior to his wrongful termination, Plaintiff was employed at BU as a professor of medicine and ophthalmology for 24 years and was a lifelong member of the BU community.

3.      BU's administrative proceeding began with an anonymous and baseless complaint against Plaintiff of sexual harassment, received by BU in October 2021, which, upon information and belief, was filed by Jane Roe[2], a former researcher in Plaintiff's laboratory at BU.

---

[1] Plaintiff John Doe intends to file a motion to proceed under a pseudonym.
[2] Jane Roe is a pseudonym.

1.

4.      Roe's motivation in filing her false allegation was evidently disappointment that Plaintiff had appropriately credited her for her contributions to two of his numerous published research papers as a "research assistant" and not, inappropriately, as a "co-author."

5.      In investigating and adjudicating Roe's false allegations, BU deprived Plaintiff of basic fairness in a disciplinary process that was neither thorough nor impartial.

6.      The entire proceeding was marred by procedural irregularities and influenced by BU decision-makers' biases and preconceived and stereotypical notions directed at Plaintiff's race (Asian), color (brown), national origin (India), age (63), and sex (male).

7.      On January 2022, in violation of BU's established policies and procedures and applicable law, and without even discussing the allegations with Plaintiff, BU placed Plaintiff on an unwarranted administrative leave, banning him from campus, though he posed no threat to the campus community or Roe.

8.      In so doing, BU wrongfully deprived Plaintiff of his capacity to perform research and work at BU for more than a year before BU concluded its discriminatory, procedurally deficient, and fundamentally unfair process.

9.      Under applicable law and BU's policies and procedures, Plaintiff was entitled to fundamental fairness and fundamental due process in BU's grievance procedures, but BU deprived Plaintiff of basic guarantees, such as the presumption of innocence, equal access to evidence, and the opportunity to be heard by an impartial decision-maker.

10.     BU's multi-step administrative process was rife with procedural irregularities.

11.     BU purported to apply no less than *three different sets of procedures* (including one that was obsolete), and *two different sets of conduct policies* (including one that was obsolete).

12.     BU's multi-step grievance process was so procedurally incomprehensible that, at each step of the proceeding, Plaintiff could only *guess* what policy and procedures BU was purporting to apply.

13.     Throughout BU's process, BU picked and chose which policies and procedures it would apply for the purpose of ensuring it could hold Plaintiff "responsible."

14.     In violation of BU's procedures and applicable law, BU failed to dismiss Roe's "anonymous" complaint, despite BU's failure to identify a claimant.

15.     In violation of its own procedures, BU consolidated the "anonymous" complaint with Roe's signed "formal complaint," and later erroneously sanctioned Plaintiff based on the unwarranted inference that he had engaged in a *"pattern"* of behavior.

16.     In all of Plaintiff's decades long career, only a single person, Roe, had ever made a complaint against him.

17.     During Plaintiff's administrative hearing, the Hearing Board irrationally attributed sexual motivations to Plaintiff's demonstrably innocuous and gender-neutral conduct, motivated by BU's gendered procedures and the Hearing Board's stereotypical notions about Plaintiff's gender, age, and national origin.

18.     The Hearing Board made discriminatory and arbitrary credibility determinations and failed to consider exculpatory evidence and testimony.

19.     The Hearing Board evaluated Plaintiff's alleged conduct under two policies: both an obsolete BU policy definition of "sexual harassment" that was vague and overbroad, and BU's current policy definition, which was clearer and more precise. BU's sole purpose in evaluating Plaintiff's alleged conduct under the obsolete policy definition was to ensure that BU could hold Plaintiff responsible for Roe's allegations.

20.     As a result, the Hearing Board illogically concluded that Plaintiff was simultaneously *"responsible"* for "sexual harassment" (under the obsolete policy) and *"not responsible"* (under BU's current policy) based on identical alleged conduct.

21.     Incredibly, although Roe's allegations, even if true, which they were *not*, *did not constitute a violation of any current BU policy*, BU issued a sanctioning report that recommended the termination of Plaintiff's faculty appointment "for cause."

22.     In further violation of BU's own policies and procedures, when Plaintiff filed his administrative appeal of his sanction, BU informed him that, *even if he prevailed on his appeal of his dismissal "for cause,"* BU would still recommend *"non-continuance"* of Plaintiff's longstanding rolling appointment.

23.     Under the terms of Plaintiff's appointment, as set forth in BU's Faculty Handbook, Plaintiff's outstanding work performance and his capacity to generate research funding for his department did not meet the criteria for a *"non-continuance"* of his faculty appointment.

24.     In the end, BU terminated Plaintiff's decades-long rolling appointment as a full-time professor "for cause," effective April 30, 2023, purportedly because of an alleged minor violation of an obsolete policy.

25.     Plaintiff's termination violated BU's own policies and procedures and Plaintiff's rights under applicable law, including his right to be free of discrimination by his employer.

26.     BU's procedures and applicable law required the University to respond *fairly and meaningfully* to allegations of sexual harassment that constitute sex discrimination. The University was prohibited from discriminating against Plaintiff by terminating his employment in a gendered proceeding influenced by the personal biases and stereotypical notions of BU's decision-makers.

27.     BU has wrongfully destroyed Plaintiff's long and distinguished career.

28.     Plaintiff, who had never previously been the subject of a single allegation or complaint of sexual misconduct, and who had devoted his entire adult life to the BU community, both as a PhD student and as a leading scientist in his field, has been personally and professionally devastated by BU's fundamentally unfair, biased, and discriminatory disciplinary process.

29.     At age 63, Plaintiff was not ready to retire, but the stigma of Plaintiff's purported "for cause" termination by BU has made it impossible for him to find employment elsewhere in his field.

30.     Because of the University's wrongful actions and omissions, Plaintiff can no longer continue to contribute as a leader in the scientific community in the field of diabetic retinopathy and as a mentor to his students and lab members.

31.     Plaintiff therefore brings this action against the Defendants, seeking compensatory and punitive damages, attorneys' fees, costs, and other equitable relief for violations arising under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq*. ("Title IX"), Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. ("Title VII"), the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq*. ("ADEA"), the Massachusetts Fair Employment Practices Act, M.G.L. c. 151B ("Chapter 151B"),  and state-law claims for breach of contract, breach of the implied covenant of good faith and fair dealing, denial of basic fairness, and estoppel.

## THE PARTIES

32.     At all relevant times, Dr. Doe was a resident of the Commonwealth of Massachusetts and an "employee" of Defendants as that term is defined by Title VII, the ADEA, and Chapter 151B.

33.     Relevant to the discrimination claims asserted herein, Plaintiff Dr. Doe is a medium-complexioned male of East Indian (South Asian) descent, who was an older employee,

aged 63, at the time Defendants instituted a discriminatory proceeding against him resulting in a decision to terminate his employment.

34.     Upon information and belief, Defendant Boston University is a private college located in the Commonwealth of Massachusetts, with its principal place of business located at One Silber Way, Boston, Massachusetts 02215.

35.     Upon information and belief, Defendant Trustees is the governing body of Boston University, and is located at One Silber Way, Eighth Floor, Boston, Massachusetts 02215.

## JURISDICTION AND VENUE

36.     This Court has federal question and supplemental jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367 because the federal law claim arises under the Constitution and statutes of the United States, and the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the United States Constitution.

37.     This Court has personal jurisdiction over the Defendants on the grounds that they conduct business within the Commonwealth of Massachusetts.

38.     At all relevant times, the actions and events discussed herein transpired within the Commonwealth of Massachusetts.

39.     Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391 because Defendants BU and the Trustees are considered to reside in this judicial district, and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

40.     On March 21, 2023, Plaintiff filed an administrative Charge of Discrimination with both the Massachusetts Commission against Discrimination ("MCAD"), MCAD Charge No. 23BEM02085, and the United States Equal Employment Opportunity Commission ("EEOC"),

EEOC Charge No. 16-C-2023-02092, against Defendants, alleging discrimination on the basis of sex, race, color, national origin, and/or age, in violation of the Massachusetts Fair Employment Practices Act, Massachusetts General Laws ch. 151B ("Chapter 151B"), of Title VII, and the ADEA.

41.     Thereafter, in accordance with M.G.L. § 151b, § 9, Plaintiff elected to withdraw his complaint from both the MCAD and the EEOC and to commence an action in this Court.

42.     On December 14, 2023, Plaintiff received notice from the MCAD that his complaint had been dismissed after being withdrawn pursuant to 804 CMR 1.08(1)(b)(2020).

43.     On December 22, 2023, Plaintiff received a Dismissal and Notice of Right to Sue from the EEOC.

44.     Accordingly, Plaintiff has timely and properly exhausted his administrative remedies and satisfied all pre-conditions to bring the within action.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

I.     **For Many Years, Students Have Exerted Pressure on BU to Combat Sexual Assault and Sexual Harassment on Campus.**

45.     For the past decade, in the midst of the #MeToo era, students have exerted ongoing pressure on BU to do more as an institution to combat the problems of sexual harassment and sexual assault on campus.

46.     After two members of BU's men's hockey team were charged with sexual assault of female students in 2011-2012, BU's President Robert Brown ("President Brown") convened a "task force" to investigate both the hockey team's culture and a possible "rape culture" at BU.  *See* Rich Barlow, *Talking about Sexual Assault on Campus, BU TODAY,* (Feb. 27, 2012), https://www.bu.edu/articles/2012/talking-about-sexual-assault-on-campus/.

47.     Relatedly, BU's Dean of Students Kenneth Elsmore co-hosted a "live chat and town hall meeting" with BU's Center for Gender, Sexuality & Activism ("CGSA") to ponder "rape culture" at BU.  *See id.*[.3]

48.     "Rape culture" is a term coined in the 1970s that is generally understood to describe the concept that society blames female victims of sexual assault and normalizes male sexual violence.

49.     Student groups simultaneously demanded that BU provide more comprehensive services for "survivors" of sexual assault. In May 2012, President Brown announced the creation of the Sexual Assault Response & Prevention Center ("SARP"), a sexual violence and prevention center, dedicated to preventing and responding to sexual assault on campus. *See* Boston University Student Health Services, https://www.bu.edu/shs/sarp/about-us/history/.

50.     Confidential findings of the task force that leaked to the press contained graphic details that suggested BU's men's hockey team had sexually assaulted female BU students with impunity. *See* Mary Carmichael, *Graphic details emerge from BU hockey panel reports,* Boston.com,   (Sept.   6,   2012),   https://www.boston.com/news/local-news/2012/09/06/graphic-details-emerge-from-bu-hockey-panel-reports/ (last visited March 11, 2024).

51.     In April 2015, a student newspaper published an open letter by a BU student who was allegedly raped on campus and accused BU's judicial committee of mishandling her sexual assault case. *See Open Letter: How BU fails sexual assault victims*, *THE DAILY FREE PRESS*, April   15,   2015,   https://dailyfreepress.com/2015/04/28/letter-to-the-editor-open-letter-how-bu-fails-sexual-assault-victims/.

---

[3] According to its website, CGSA is a student organization that "aims to end gender oppression and violence, and advocates for the full equality and inclusion of women, queer and trans students." The Center for Gender, Sexuality, and Activism at Boston University, https://www.bu.edu/cgsa/about-us/.

52.     The student specifically condemned Provost and Chief Academic Officer Jean Morrison ("Provost Morrison") for her perceived lack of sensitivity and her decision to grant a stay of her rapist's suspension following his appeal. *See id.*

53.     According to a survey conducted by the Association for American Universities, the "Climate Campus Survey," published in October 2019, indicated that "one-third of [BU's] undergraduate women reported "some type of nonconsensual sexual contact" and "[m]ore than 20 percent of BU undergraduate women said they were victims of incidents involving physical force or the inability to consent to, or stop, what was happening." *See* Amy Laskowski, *Students Protest University's Handling of Sexual Assault Cases*, *BU TODAY*, (Feb. 9, 2021), https://www.bu.edu/articles/2021/students-protest-university-handling-of-sexual-assault-cases/, (last visited Aug. 18, 2023).

### A. Students Protest BU's Perceived Failure to Hold Male "Rapists" Accountable.

54.     In May of 2020, a group of BU students started, @Campus.Survivors, an Instagram account where students could anonymously post their experiences of sexual assault and harassment on BU's campus. *See* Melissa Ellin, *BU undergrads give voice to sexual assault survivors via social media*, THE DAILY FREE PRESS, (May 17, 2020), https://dailyfreepress.com/2020/05/17/bu-undergrads-give-voice-to-sexual-assault-survivors-via-social-media/.[4]

55.     In February 2021, after Sujin Kumar, a co-founder of Campus Survivors published two open letters condemning BU's perceived indifference to the University's "ongoing rape culture," Ms. Kumar and Campus Survivors organized a protest in which more than 600 students

---

[4] The Campus Survivors' website describes itself as "[a] safe place for survivors of sexual violence or any kind of assault" to share their stories anonymously and states that it does "not verify any submissions." *See* Campus Survivors, https://www.instagram.com/campus.survivors/?hl=enz.

braved a snowstorm to protest BU's "complicity" in BU's perceived "rape problem." *See* Lily Kepner, *Campus Survivors holds sexual assault protest, demands University listen*, THE DAILY FREE PRESS, (Feb. 8, 2021), https://dailyfreepress.com/2021/02/08/campus-survivors-holds-sexual-assault-protest-demands-university-listen/.

56.     Students participating remotely emailed BU administrators a link to a Campus Survivors document detailing "98 BU-specific accounts of sexual assault" that had been posted on @campus-survivors since the organization's creation in May 2020, including anonymous posts describing alleged sexual assaults by BU faculty. *See id.*; "Campus Survivors Stories," https://docs.google.com/document/d/1B5MTZ2IGWoJQCRKst1DP53HrQinmdjAGs1zHSIBdthM/edit (last visited December 4, 2023).

57.     Student protesters expressed outrage that BU was not supporting "victims" of sexual assault and was "defending rapists," including faculty members who were the subject of anonymous accusations on the Campus Survivors' website. *See Campus Survivors holds sexual assault protest, demands University listen, supra,* Campus Survivors Stories, *supra.*

58.     Immediately following the protest, students who were reportedly "incensed" at having received no response from University administrators "flooded the inboxes" of President Brown and other BU officials "and took to social media to voice their anger." *See* Amy Laskowski, *Students Protest University's Handling of Sexual Assault Cases*, *BU TODAY*, (Feb. 9, 2021), https://www.bu.edu/articles/2021/students-protest-university-handling-of-sexual-assault-cases/. Students disseminated a list of demands to BU which included "a public statement acknowledging sexual assault and sexual harassment at BU" and the quick enactment of "a zero-tolerance policy for all faculty." *See id.*

59.     The following afternoon, President Brown began sending individual letters to the more than 280 students who emailed him, and made a public statement to *BU TODAY* in which he emphasized that the University found "any form of sexual assault or harassment 'reprehensible" and that BU was fully investigating every case that was brought to its attention, and thanked students for "sharing victims' accounts by email." *Id.*

60.     In May 2021, Provost Morrison sent a letter to all BU students, outlining "new commitments BU [was] making to help prevent sexual assaults from happening on campus and to improve policies around reporting and investigating processes for assaults." *See* Alene Bouranova, *Answering Students' Concerns, Provost Pledges New Commitments on Sexual Assault Cases*, *BU TODAY,* (May 24, 2021), https://www.bu.edu/articles/2021/answering-students-concerns-provost-pledges-new-commitments-on-sexual-assault-cases/. The commitments reportedly stemmed from talks with members of student groups like Campus Survivors. *Id.*

**B.  Students Ongoing Demands That BU "Believe All Women."**

61.     Despite such efforts, students have continued to scrutinize the University's institutional response, alternatively criticizing BU for its perceived failure to enforce policies against male "perpetrators" or praising BU for its perceived support of "survivors" and "victims" of sexual harassment.

62.     Reports and commentaries in student newspapers reflect the pressure on BU by students to embrace the #MeToo slogan, "believe all women." Articles refer to those who allege sexual harassment (predominantly female) as "victims" or "survivors," and to those accused of sexual harassment (predominantly male) as "perpetrators," irrespective of whether a determination of responsibility has been made through a fair and impartial grievance procedure.

63.     For example, on April 21, 2022, *THE DAILY FREE PRESS*, a BU student newspaper, reported on its own in-depth investigation of a former female student's three-year old (unverified) allegation that a male BU assistant professor had sexually assaulted her, *see* Walker Armstrong, *Former, current students accuse BU assistant professor Christophor Cavalieri of sexual misconduct, THE DAILY FREE PRESS,* April 21, 2022, https://dailyfreepress.com/2022/04/21/former-current-students-accuse-bu-assistant-professor-christophor-cavalieri-of-sexual-misconduct/. The report included comments by an off-campus, female professor who referred to the accuser as "the victim" and who opined that, in such cases, "the perpetrator is typically a respected individual in their field," that universities sweep sexual harassment by faculty "under the table" and that "sexual harassment and sexual violence is an underreported phenomenon." *Id.*

64.     As another example, on September 8, 2021, *THE DAILY FREE PRESS* reported that a BU student (whose identity was not disclosed) went on the dating app Bumble and, after changing the age of people they could match with "to the highest it can go," was "matched" with BU College of Fine Arts professor Eric Ruske, who flirted with the student in the messaging chat. *See Students question University's commitment to sexual misconduct prevention after accused CFA professor messages student through Bumble, THE DAILY FREE PRESS,* September 8, 2021, https://dailyfreepress.com/2021/09/08/students-question-universitys-commitment-to-sexual-misconduct-prevention-after-accused-cfa-professor-messages-student-through-bumble/.     The student, who claimed to have interacted with Ruske on Bumble, cited a culture of "victim-blaming" and a general distrust that anything would be taken seriously as the reasons they chose to not report the incident and remained anonymous. *Id.*

65.     BU students were reportedly outraged that BU permitted Ruske to remain a member of the CFA faculty after two female students had filed a lawsuit against him for sexual harassment in 2016 and that he was still comfortable "messaging 19-year-old BU students." *Id.* Ms. Kumar, a co-founder of Campus Survivors, reportedly stated that there was "substantial proof" that Ruske was "a predator . . . and he is harming the community activity. BU can say so much, but they're not actually doing anything to stop it." *Id.*

66.     These events, and the resulting pressure on BU to aggressively discipline male faculty members accused of sexual misconduct, preceded the filing of false sexual allegations against Plaintiff.

## II.     The Office for Civil Rights Pressures Universities to Aggressively Pursue Sexual Misconduct Complaints.

67.     On April 4, 2011, the United States Department of Education in the Office for Civil Rights ("OCR") issued a guidance document to colleges and universities in receipt of federal funding, which became widely known as the "April 2011 Dear Colleague Letter" ("2011 DCL"). *See* [RESCINDED] *Dear Colleague: From Assistant Secretary for Civil Rights*, Russlynn Ali, https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf.

68.     The 2011 DCL advised recipients that sexual violence constitutes sexual harassment within the meaning of Title IX of the Education Amendments of 1972 and its regulations and directed schools "to take immediate action to eliminate the harassment, prevent its recurrence, and address its effects." 2011 DCL at 4.[5]

---

[5] The 2011 DCL directed schools to respond to "sexual harassment," which it defined to include "unwelcome conduct of a sexual nature," and "conduct . . . sufficiently serious that it interferes with or limits a student's ability to participate in or benefit from the school's program." *See* 2011 DCL at 3.

69.     Despite its purported purpose as a mere guidance letter, the Department of Education treated the 2011 DCL as a binding regulation and pressured colleges and universities to aggressively pursue investigations of sexual assault on campus.

70.     The 2011 DCL, while not completely ignoring due process concerns, suggested that schools should focus on victim advocacy and "minimize the burden on the complainant," *id.* at 15–16.

71.     On April 29, 2014, the OCR issued additional directives to colleges and universities in the form of a guidance document titled *Questions and Answers on Title IX and Sexual Violence* (the "2014 Q&A"), which was aimed at addressing campus sexual misconduct policies and advised schools to adopt a "trauma-informed" approach, advising, for example, that hearings should be "conducted in a manner that does not inflict additional trauma on the complainant." *See* Q&A at 31, https://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf.

72.     In addition, the 2014 Q&A continued OCR's quest to hamper students' ability to defend themselves by reducing or eliminating the ability to expose credibility flaws in the allegations made against them. *Id.* at 25-31.

73.     In the same month that the OCR issued its 2014 Q&A on Title IX, the White House issued a report titled *Not Alone*, which included a warning that if the OCR finds a school in violation of Title IX, the "school risks losing federal funds." *See* White House Task Force to Protect Students from Sexual Assault, *Not Alone* (Apr. 2014), https://obamawhitehouse.archives.gov/sites/default/files/docs/report_0.pdf. The report further advised that the Department of Justice ("DOJ") shared authority with OCR for enforcing Title IX, and could initiate investigations, compliance review, and/or litigation against schools suspected of violating Title IX. *See id.*

74.     In June of 2014, then-Assistant Secretary of Education Catherine Lhamon testified before the United States Senate, warning that if the OCR could not secure voluntary compliance with the 2011 DCL from a college or university, it could elect to initiate an administrative action to terminate federal funds or refer the case to the DOJ. *See Testimony of Catherine E. Lhamon, Assistant Secretary Office for Civil Rights, U.S. Dep't of Educ.,* (June 26, 2014), https://www2.ed.gov/about/offices/list/ocr/correspondence/testimony/20140626-sexual-violence.pdf.

75.     Following the 2011 DCL, OCR put considerable pressure on universities to treat those accused of sexual misconduct—especially men—with a presumption of guilt. *See Robin Wilson, Presumed Guilty: College men accused of rape say the scales are tipped against them, CHRONICLE OF HIGHER EDUCATION,* (Sept. 1, 2014), https://www.chronicle.com/article/presumed-guilty/.

**III.     The OCR Rescinds the 2011 DCL and Adopts Enhanced Due Process Protections.**

76.     On September 22, 2017, the OCR formally rescinded the 2011 DCL and 2014 Q&A and put in place interim guidance (the "2017 Dear Colleague Letter" or "2017 DCL), while the OCR reviewed and revised its practices regarding the adjudication of complaints of sexual misconduct on college campuses. *See Dep't of Educ., Dear Colleague Letter* (Sept. 22, 2017), *https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf*.

77.      In rescinding the 2011 DCL, the OCR noted that it had placed "improper pressure upon universities to adopt procedures that do not afford fundamental fairness," and "lack the most basic elements of fairness and due process, are overwhelmingly stacked against the accused, and *are in no way required by Title IX law or regulation*." *See id.* (citations omitted) (emphasis added).

15.

78.     As former Secretary of Education Betsy DeVos noted, the rescission of the 2011 DCL was largely motivated by "[t]he truth . . . that the system established by the prior administration has failed too many students," specifically because "[t]he notion that a school must diminish due process rights to better serve the 'victim' only creates more victims." Press Release, Secretary DeVos Prepared Remarks on Title IX Enforcement (Sept. 7, 2017), available at https://www.ed.gov/news/speeches/secretary-devos-prepared-remarks-title-ix-enforcement.

79.     The OCR contemporaneously put in place an interim guidance, U.S. Department of Education, *Q&A on Campus Sexual Misconduct* (Sept. 2017), https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf [hereinafter 2017 Q&A], while conducting a rulemaking process that would eventually lead to new binding Title IX regulations. The 2017 Q&A directed schools to "adopt and publish grievance procedures that provide for a *prompt and equitable* resolution of complaints of sex discrimination, including sexual misconduct." *See* 2017 Q&A at 3 (citing 34 C.F.R. 106.8(b) and OCR guidance from 2001) (emphasis added)*.*

### A.  BU Rejects the New Guidance and Proposed Changes to Title IX

80.     On September 27, 2017, just days after the DOE rescinded the 2011 DCL and 2014 DCL and issued the 2017 DCL, interim guidance that would remain in effect until August 26, 2020 following the passage of binding regulations, Provost Morrison sent an open letter to members of the BU community in which she expressed BU's opposition to the interim guidance.

81.     Provost Morrison declared that, "BU "[did] not plan to make any changes to its current Sexual Misconduct/Title IX Policy or Student Sexual Misconduct Procedures." *See Changes to Title IX Guidance, from Dr. Jean Morrison, BU Provst and Chief Academic Officer,*

BU Dean Morrison's September 27, 2017 letter, https://www.bu.edu/provost/2017/09/27/changes-to-title-ix-guidance/ (last visited Aug. 18, 2023).

82.    Dean Morrison opined, "[w]e remain confident that these policies and procedures—which were substantially revised in 2015—fulfill the Department of Education's mandate that educational institutions address sexual misconduct in a manner that is fair, impartial, and respects the rights of all parties." *See id.*

83.    In the interest of being seen as protecting, supporting, and believing female students, BU openly opposed and resisted the new guidance and proposed changes to the Title IX regulations that were intended to restore due process to campus proceedings and remedy the pervasive problem of universities railroading men.

84.    Despite the different direction that OCR was taking to provide equal procedural protections to accuser and accused, BU continued to utilize victim-centered practices and policies, holding on, as a matter of ideological commitment, to what is a gender-biased enforcement of Title IX.

85.    In January 2019, in response to the proposed changes to federal Title IX regulations, BU's President Brown wrote a letter to the U.S. Department of Education in which he argued in opposition to the changes, contending the proposed regulations would deter victims of sexual misconduct from coming forward. *See BU Urges Department of Education to Rethink Title IX Changes*, https://www.bu.edu/articles/2019/bu-urges-department-of-education-to-rethink-title-ix-changes/.

86.    The director of BU's Sexual Assault Response and Prevention Center commended Brown for his letter, agreeing that the proposed changes "would deter survivor/victims from pursuing resolution." *See President Brown writes opposition letter to proposed Title IX changes,*

Jan. 29, 2019, https://dailyfreepress.com/2019/01/29/president-brown-writes-opposition-letter-to-proposed-title-ix-changes/.

### B.  OCR Releases Final Regulations, Taking Effect August 14, 2020

87.    On May 6, 2020, the United States Department of Education released final Title IX regulations, (the "2020 Title IX Regulations"), which took effect on August 14, 2020. *See Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistanc*e, 85 Fed. Reg. 30,026 (May 19, 2020) (codified at 34 C.F.R. pt. 106).

88.    In a significant departure from the rescinded 2011 DCL and the 2014 Q&A, the 2020 Title IX Amendments make clear, *inter alia*, that schools can be found to discriminate on the basis of sex by treating either the complainant or the respondent unfairly; that parties must be provided a live hearing with cross-examination and access to the complaint, the evidence from the investigation, and a written decision carefully addressing the evidence; that respondents must be presumed not responsible; that all relevant evidence must be evaluated objectively; that investigators and decisionmakers must receive non-biased training, may not rely on sex stereotypes, and must be impartial; and must explain delays for good cause in the timeframe of the process in writing. *See* 34 C.F.R. § 106.45.

89.    In addition, the 2020 Title IX Amendments contain a three-pronged definition of "sexual harassment" that includes conduct on the basis of sex that satisfies one of the following criteria: (i) quid pro quo harassment; (ii) certain offenses under the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act, 20 U.S.C. § 1092(f), and the Violence Against Women Reauthorization Act of 2013, 34 U.S.C. § 12291 *et seq*.; and, (iii) "unwelcome conduct determined by a reasonable person to be so severe, pervasive, and objectively offensive

that it effectively denies a person equal access to the recipient's education program or activity." *See* 34 C.F.R. § 106.30(a) (emphasis added).[6]

90.     Prior to the 2020 Title IX Amendments, there had only been vague, non-binding guidance as to what conduct constituted "sexual harassment," which was inconsistent with judicial precedents. *See Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistanc*e, 85 Fed. Reg/ 30,037 (May 19, 2020).

91.     "By utilizing precise definitions of conduct that constitutes sexual harassment," and incorporating a "reasonable person" standard into the definition's third prong, the Department of Education sought "to reduce uncertainty and confusion for recipients, students, and employees, while ensuring conduct that jeopardizes equal educational access remains conduct to which a recipient must respond under Title IX." *See id.*

92.     On July 6, 2020, Provost Morrison and other members of BU's leadership sent a letter to all BU students, faculty, and staff regarding the federal changes to Title IX Regulations. The memo announced that, "[t]his summer, in anticipation of the new regulations going into effect on August 14, 2020, we will make the federally mandated changes to the Title IX definitions and procedures and will provide notice of these changes to members of the University community."

93.     BU recognized its obligation to create a grievance procedure that affords both complainants and respondents a fair proceeding and due process rights, and to implement the regulatory changes for conduct that constitutes prohibited conduct under Title IX.

---

[6] Under the 2020 Title IX Amendments, the full definition of sexual harassment is "conduct on the basis of sex that satisfies one or more of the following: (1) An employee of the recipient conditioning the provision of an aid, benefit, or service of the recipient on an individual's participation in unwelcome sexual conduct; (2) Unwelcome conduct determined by a reasonable person to be so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the recipient's education program or activity; or (3) 'Sexual assault' as defined in 20 U.S.C. 1092(f)(6)(A)(v), 'dating violence' as defined in 34 U.S.C. 12291(a)(10), 'domestic violence' as defined in 34 U.S.C. 12291(a)(8), or 'stalking' as defined in 34 U.S.C. 12291(a)(30)."

94.     Despite BU'S recognition of its obligations, in Dr. Doe's case, BU chose to split its process so that part of the complaint was adjudicated pursuant to its pre-August 14, 2020 policies and procedures.

95.     In Plaintiff's case, BU's application of a two-track process to investigate and adjudicate allegations of sexual harassment was discriminatory, based on BU's motivation to ensure that Dr. Doe would be found "responsible" with no real due process protections.

**IV.    Plaintiff's Professional Background and Employment at the University.**

96.     Dr. Doe is a world-renowned scientist in the field of diabetic retinopathy, a leading cause of vision impairment affecting millions of people worldwide.

97.     Dr. Doe has received numerous awards for his contributions as a leading scientist in his field, including research grants and awards from the Juvenile Diabetes Research Foundation, American Diabetes Association, and the National Eye Institute, NIH.

98.     Between 1986 and 2022, Dr. Doe authored or co-authored 100 articles published in scholarly, peer-reviewed medical journals, including seventeen articles published between 2019 and 2022, alone.

99.     As a young man, Dr. Doe received a merit scholarship to study at the University of Kalyani in West Bengal, India in 1977, where he received his Bachelor of Science degree, graduating summa cum laude in 1979.

100.     After receiving a National Merit Scholarship, Dr. Doe pursued graduate studies at the University of Kalyani, graduating summa cum laude with a Master of Science degree in 1983.

101.     Dr. Doe came to the United States to pursue his doctorate and earned his Ph.D. from BU in 1989.

102.    Between 1990 and 1994, Dr. Doe completed his postdoctoral training as a Research Fellow at Harvard Medical School in its Department of Ophthalmology.

103.    Between 1987 and 1998, Dr. Doe served in academic appointments at Harvard Medical School, as a research scientist and instructor, until he left to take a position with BU.

104.    Beginning in 1999 and up until April 30, 2023, when Defendants wrongfully terminated Dr. Doe's faculty appointment in the middle of its term, Dr. Doe continuously held academic appointments at the BU School of Medicine ("SOM").

105.    Between 1999 to 2004, Dr. Doe held an appointment at BU as an Assistant Professor of Ophthalmology.

106.    Between 2004 to 2010, Dr. Doe held an appointment at BU as Associate Professor of Ophthalmology and Associate Professor of Medicine.

107.    Between 2009 to 2010, Dr. Doe held an appointment as Associate Professor of Molecular Medicine.

108.    Between 2010 until April 30, 2023, Dr. Doe was a Professor of Ophthalmology, and Professor of Medicine in the Section of Endocrinology, Diabetes & Nutrition at the BU SOM.

109.    Dr. Doe has supervised approximately 100 lab personnel, including non-student research assistants employed by BU.

110.    During the course of his 24-year career as a professor at BU SOM, Dr. Doe mentored numerous medical students, graduate students, and undergraduate students who have worked in his lab as "research student trainees."

111.    Dr. Doe was named the 2006 "Mentor of the Year" by BU.

112.    Up until the false claim of sexual harassment filed by a former lab employee, Jane Roe, Dr. Doe had an unblemished disciplinary record at BU and had never been the subject of a complaint of any nature.

### A. Faculty Handbook Policies Governing Plaintiff's Employment

#### i. Appointment Policy

113.    At all relevant times, Dr. Doe was a full-time professor employed at BU whose employment was subject to the terms of his appointment as a Professor of Medicine in the SOM, as outlined by the policies set forth in the Faculty Handbook ("Handbook").

114.    Under the Handbook's policy on "Appointment and Continuance of Appointments for Full-Time Faculty on the Medical Campus" ("Appointment Policy"), a full-time professor at the SOM has a "rolling appointment," meaning that, "[u]pon the expiration of the initial term of an appointment" and, "in the absence of notice of non-continuance or termination . . . , the appointment shall be automatically continued as a rolling appointment."

115.    Under the Appointment Policy, Dr. Doe, as a full-time professor, had an expectation that his appointment would be continuously renewed, without lapse, unless non-continuance was recommended based on criteria outlined in the Appointment Policy, that is "based on merit," subject to "institutional needs and goals" involving consideration of factors such as "academic needs of the programs" and "availability of resources."

116.    Under Section C of the Appointment Policy, if a full-time professor like Dr. Doe receives a notice of non-continuance, he is entitled, at a minimum, to a three-year wind-down period from the date of issue, with a guarantee of 100 percent of his salary in year one, and 80 percent of his salary in years two and three.

117.    BU has never had any basis to issue Dr. Doe a notice of non-continuance.

### ii.  Suspension or Termination for Cause

118.    The Handbook's "Suspension or Termination for Cause" policy ("For Cause Policy"), sets forth the rules applicable to "for cause" suspension or termination of a faculty member during the term of an appointment.

119.    Under the For Cause Policy, "[w]hen allegations of sexual misconduct . . .  have been made against a faculty member, the allegations shall be investigated using the procedures set forth in the University's Procedures for the Resolution of Sexual Misconduct Complaints Against Faculty, Staff, Affiliates, and Non Affiliates," and the hearing committee is to recommend "suspension, termination, or other appropriate discipline" based on principles of proportionality.

120.    The For Cause Policy was last revised prior to the promulgation of the 2020 Title IX Regulations.

121.    To the extent the 2020 Title IX Regulations and the "procedures" referenced in the Handbook's For Cause Policy conflict, the 2020 Title IX Regulations take precedence.

### iii.  BU's Sexual Misconduct and Title IX Policies and Procedures Before and After August 14, 2020.

### a.  Pre-August 14, 2020 Policy and Procedures

122.    Under a policy that was effective June 1, 2015, to August 13, 2020, BU analyzed sexual harassment complaints pursuant to its "Sexual Misconduct/Title IX Policy (**"Pre-August 14, 2020 Policy"**), and applied the corresponding Procedures for the Resolution of Sexual Misconduct Complaints against Faculty, Staff, Affiliated, and Non-Affiliates" (**"Pre-August 14, 2020 Procedures"**).

123.    The Pre-August 14, 2020 Policy provided the following definition for the term "sexual harassment":

23.

'Sexual Harassment' is unwelcome conduct of a sexual nature that has the effect of creating a hostile or stressful living, learning, or working environment, or whenever toleration of such conduct or rejection of it is the basis for an academic or employment decision affecting an individual. Conduct is considered 'unwelcome' if the person did not request or invite it and considered the conduct to be undesirable or offensive. Sexual harassment includes any conduct or incident that is sufficiently serious that it is likely to limit or deny a student's ability to participate in or benefit from the University's educational programs or a faculty or staff member's ability to work, which may include a single incident of sexual assault or other serious sexual misconduct.

### b. Post-August 2020 Policy and Procedures

124.    On August 14, 2020 BU replaced its Pre-August 14, 2020 Policy "in its entirety" by its "Sexual Misconduct Policy" (**"Post-August 14, 2020 Policy"**), which BU made applicable to "conduct that occurs on or after August 14, 2020."

125.    On October 13, 2021, BU issued corresponding procedures, the "Procedures for the Resolution of Title IX Sexual Misconduct Complaints Against Students, Faculty, Staff, Affiliates, and Non-Affiliates," (**"Procedures"**), that were retroactively effective to August 1, 2021, and applicable to conduct "*occurring on or after August 14, 2020."*

126.    In conformity with the 2020 Title IX Regulations, the "**Post-August 2020 Policy**" clarified the definition of the term "sexual harassment" under the former policy, providing that:

'Sexual harassment' means unwelcome conduct that a reasonable person would determine to be so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the University's education programs or activity.

### V.    Chronology of Events

### A.  Dr. Doe Meets and Hires Jane Roe to Work As An Employee In His Lab.

127.    Dr. Doe met Roe in July 2019 when she was working as a server and waited on Dr. Doe and his family while they were dining out at a restaurant.

128.    Over the course of the meal, Dr. Doe engaged in cordial and friendly conversation with Roe.

129.    Roe informed Dr. Doe that she had recently graduated from college and was looking for research experience.

130.    Dr. Doe told Roe that he was a professor who did medical research, and that if she was interested in working in his lab, she could contact him.

131.    Roe later interviewed for a volunteer position in Dr. Doe's lab and began volunteering on or about August 19, 2019.

132.    Roe subsequently obtained employment as a part-time Research Assistant with Boston Medical Center ("BMC"), BU's affiliated teaching hospital, and was assigned to Dr. Doe's laboratory in the endocrinology department, where she worked until April 2, 2021.

133.    During her tenure of approximately 19 months, (comprised of five (5) months as a volunteer and 14 months as a part-time Research Assistant, minus a few months due to COVID), Roe worked with Dr. Doe and other lab employees, and Dr. Doe and Roe maintained a cordial relationship as colleagues, and never engaged in sexual discussion or contact.

134.    Upon information and belief, Roe left her position in the lab because she felt she was not making enough money, did not like research, wanted to pursue clinical work, and had found a position as an ophthalmic technician.

135.    When Roe resigned on April 2, 2021, she emailed Jennifer Fosbroke, Sr. Administrative Director, adding that she "had such a wonderful experience with [her] colleagues and Dr. [Doe]," and added that he was "an incredible mentor."

136.    Roe wrote a letter to Dr. Doe, thanking him for all he had done for her:

Dear Dr. [Doe]

Thank you from the bottom of my heart for the opportunity to be part of your lab. I can confidently say that I wouldn't have grown and learned as much as I have in the past 1.5 years without your constant support and mentorship. While I am going to greatly miss the pure satisfaction that RTD

has come to bring me, I will especially miss the love and care that you shared for me. I have strong feeling our days of table tennis tournaments and karaoke are not quite over!

As a result of my experience in your lab, I am more excited than ever to pursue a career in optometry, and feel well-equipped to take on whatever life throws at me along the way.  While my time at the lab has come to an end, I cannot wait to continue to make you proud. Our dreams of me becoming Dr. [Jane Roe] will most certainly be a reality one day. I will be performing an eye exam on you, just like we always talked about! But for now, I want to again express my utmost gratitude for everything you've done for me.

Sincerely,

[Jane Roe]

**B.  BU Receives an Anonymous Report Concerning Dr. Doe.**

137.    On October 15, 2021, Dr. Doe received a "Notice of Investigation and Allegations" ("October 15 NOIA") from Jessica Nagle ("Nagle"), the Title IX Coordinator of BU's Equal Opportunity Office ("EOO"), informing him that BU received an "anonymous report" on October 7, 2021.

138.    The October 15 NOIA informed Dr. Doe that the anonymous complainant alleged that, "for more than a year since January 2021," he had "'inappropriately touched more than three women, including . . .  [the anonymous complainant], in ways that are completely unprofessional and can be classified as harassment," including "hugging the employee and placing his face in her chest," and that "[m]any of these women, including [herself], have since left his lab.'"

139.    The October 15 NOIA informed Dr. Doe that the EOO would conduct an investigation of these allegations "pursuant to BU's Sexual Misconduct Policy. . .  that applies to conduct that occurred on or after August 14, 2020," and "The Procedures for the Resolution of Non-Title IX Sexual Misconduct Complaints Against Faculty, Staff, Affiliates, and Non-Affiliates" ("Procedures for the Resolution of Non-Title IX Complaints").

140.    Under the Procedures for the Resolution of Non-Title IX Complaints, § III.D, "[t]he University will seek to resolve every report of sexual misconduct within 90 calendar days after the filing of a complaint."

141.    On October 28, 2021, Nagle notified Dr. Doe that BU retained Elizabeth Sanghavi ("Sanghavi") and Tracy Kennedy ("Kennedy") from Sanghavi Law office to serve as neutral investigators.

### C.  BU Delays the Investigation of the Anonymous Report, in Violation of Its Non-Title IX Procedures.

142.    On January 23, 2022, Dr. Doe received a notice of delay from BU, advising him that investigators were attempting to conclude their interviews "this week" and that BU would not be able to complete the "grievance process" within 90 days, but anticipated the "grievance process" would be completed on or before February 20, 2022.

143.    Unbeknownst to Dr. Doe, January 23, 2022 was also the day that Jane Roe signed her so-called "formal complaint" with BU's Title IX office.

144.    Upon information and belief, BU was not conducting interviews with witnesses, and should have dismissed the anonymous complaint without delay, as required by its procedures.

### D.  BU Places Dr. Doe on an Unwarranted Administrative Leave, in Violation of Its Procedures and Title IX.

145.    On January 27, 2022, without informing Dr. Doe of Roe's complaint or the allegations against him, Dr. David Coleman ("Dr. Coleman"), the former Chair of the BU Department of Medicine, placed Dr. Doe on administrative leave.

146.    Dr. Coleman instructed Dr. Doe to turn in his keys and badges by the close of business and to stay off campus and to contact Nagle to see if she had any questions or needed information from him.

147. No one at BU provided Dr. Doe information concerning the basis for his removal from campus.

148. As instructed, Dr. Doe returned the items to Dr. Coleman and on the evening of January 27, 2022, Dr. Doe emailed Nagle to see if she needed any information from him.

149. Under the Procedures, BU is not permitted to remove the accused (a "respondent") from campus unless BU first conducts "an individualized safety and risk analysis" and determines the respondent poses an "*immediate threat to the physical health or safety*" of an individual "**and** *that the threat arises from the allegations of Title IX Sexual Misconduct.*"

150. BU never conducted an individualized safety and risk analysis or determined that Dr. Doe was a threat to health or safety arising from allegations of Title IX sexual misconduct.

151. Dr. Doe posed no threat to the health or safety of Roe (who had resigned from the job about 10 months prior on April 2, 2021) or any other person.

152. Dr. Doe's removal violated his rights under the 2020 Title IX Regulations, which permit an institution to place a non-student employee respondent on administrative leave during the pendency of a grievance process that complies with 34 C.F.R. § 106.44(d).

153. Here, where there was only an anonymous report of sexual harassment and BU failed to afford Dr. Doe the robust procedural protections of a grievance process compliant with § 106.45, his placement on administrative leave was unreasonably burdensome and unlawful.

154. BU's unfair treatment of Dr. Doe reflects BU's gender-biased treatment against respondents.

### *E. Roe's Complaint Was Subject to Dismissal Under BU's Procedures.*

155. On February 2, 2022, while the purported anonymous report against Dr. Doe was still pending, Dr. Doe received an updated and revised "notice of investigation and allegations" ("February 2 NOIA") from Nagle.

156. The February 2 NOIA advised Dr. Doe that, on January 23, 2022, BU received a "signed Formal Complaint" from Roe who alleged that Dr. Doe had "engaged in sexual harassment toward her while she worked in [his] lab from August 19, 2019 to April 2021."

157. Roe's so-called "Formal Complaint" alleged that Dr. Doe:

> (1) "touched her shoulder, hugged, held her hand and kissed her daily from August 2019 to April 2021 in a BU laboratory";

> (2) "remarked on her physical appearance on more than one occasion," and "measured her body proportions to purchase her traditional Indian clothing and bought her jeans because [he] wished to see the way they looked on her physique," and "[w]hen [she] wore the jeans, . . . asked her to turn around to show how the jeans looked on her body";

> (3) "repeatedly telephoned her at night and reacted negatively if she did not answer [his] call"; and,

> (4) "retaliated against her when she left the University by removing her name as co-author on two publications."

158. The February 2 NOIA also informed Doe that BU was updating the October 15 NOIA, and that the "anonymous reporter" would now be referred to as "Complainant 1" and that Roe would be referred to as "Complainant 2."

159. Under the Procedures, a "complainant" is defined as, "[a]ny person who has reported being or is alleged to be the victim of conduct that would constitute Title Sexual Misconduct and, *at the time of filing* a Complaint or Formal Complaint, is participating or attempting to participate in a university program or activity" (emphasis supplied).

160.    The Procedures explicitly bar the filing of a "formal complaint" unless the complainant is actively involved in or attempting to participate in an education program or activity "at the time the complaint is made."

161.    Under BU's Procedures, as under the 2020 Title IX Regulations, BU should have dismissed Roe's signed complaint because she was not participating in or attempting to participate in a BU program or activity at the time she filed her report and had resigned from her job at BU nine (9) months before filing. *See* 34 C.F.R. § 106.30(a).

### F.  BU Violated its Procedures and Title IX By Consolidating Roe's "Formal Complaint" with the Anonymous Complaint.

162.    The February 2 NOIA informed Dr. Doe that BU decided to *consolidate* Roe's signed complaint with the so-called anonymous complaint filed against him three months prior.

163.    The Procedures permit consolidation of only "*formal complaints,*" and prohibited BU from consolidating the anonymous report and Roe's signed complaint since neither met the definition of a "formal complaint."

164.    Under the Procedures, as under the 2020 Title IX Regulations, a signed formal complaint is a requisite to initiate a grievance process (i.e., an investigation, adjudication, and appeal). *See* 34 C.F.R. § 106.30(a).

165.    As a matter of fundamental due process and fundamental fairness, a complainant cannot file a formal complaint anonymously in a Title IX grievance proceeding, (i.e., an investigation and adjudication). *See* 34 C.F.R. §§ 106.30(a), 106.45(b)(2) (a formal complaint must include certain details about the allegations, including the identity of the parties); *see also* Nondiscrimination on the Basis of Sex in Educ., 85 Fed. Reg. 30,133 (May 19, 2020).

166.    These requirements of due process and fundamental fairness are incorporated in BU's Procedures, which also prohibit anonymous complaints.

167.    Moreover, under its *non-Title IX* procedures, BU was required to dismiss the anonymous complaint against Dr. Doe within the 90-day timeframe required by the Procedures for the Resolution of Non-Title IX Complaints.

168.    The February 2 NOIA further informed Dr. Doe that the "anonymous reporter" would now be referred to as "Complainant 1" and that Roe would be referred to as "Complainant 2", and that BU had assigned the same two investigators to investigate both the anonymous complaint and the new complaint filed by Roe.

169.    BU never identified the so-called Complainant 1. Upon information and belief, "Complainant 1" was Jane Roe.

170.    Under the Procedures and the 2020 Title IX Regulations, Dr. Doe was entitled to a "presumption that he was not responsible for the alleged conduct until a determination regarding responsibility is made at the conclusion of the grievance process." *See* 34 C.F.R. § 106.45.

171.    BU's consolidation of the anonymous complaint with Roe's so-called formal complaint prejudiced Dr. Doe's rights to a fair and equitable investigation, adjudication, and appeal.

172.    As a result of BU's failure to timely dismiss the anonymous complaint as against Dr. Doe, BU's investigators, adjudicators, and decision-makers in his Title IX grievance proceeding prejudged him based on an erroneous, unwarranted inference that there was a second complainant and a "pattern" of behavior, where none existed.

### G.  BU Presents Dr. Doe with a Procedurally Opaque Title IX Process.

173.    BU violated Dr. Doe's right to a prompt and equitable grievance process by presenting Dr. Doe with policies and procedures that were near incomprehensible.

174.   The February 2 NOIA confusingly informed Dr. Doe that, "[d]ue to the time period of the allegations" in Roe's signed, "formal complaint," he was "alleged to have violated ***two policies,*** specifically the Sexual Misconduct/Title IX Policy [the Pre-August 14, 2020 Policy] and the Sexual Misconduct Policy [the Post-August 2020 Policy]." (Emphasis added.)

175.   The February 2 NOIA advised that, "[a]llegations occurring before August 14, 2020, are covered under the Sexual Misconduct/Title IX Policy, and allegations occurring on or after August 14, 2020, are covered under the Sexual Misconduct Policy," and quoted the two different definitions of "sexual harassment" under the Pre- and Post-2020 policies.

176.   BU's Post-2020 Policy definition of "sexual harassment" comports with the Title IX Regulations definition, *see* C.F.R. § 106.30, by providing a "clear, rational, understandable definition as opposed to the overly broad and vague definition set forth in BU's Pre-August 14, 2020 Policy.

177.   BU's Post-2020 Policy, like the 2020 Title IX Regulations, defines "sexual harassment" as severe, pervasive conduct that denies equal access to an education, not conduct or speech that is merely "unwelcome," which is overly broad and vague.

178.   The Department of Education has explained that the regulatory "definition of sexual harassment is designed to hold recipients accountable for meaningful, fair responses to sexual harassment that violates a person's civil right to be free from sex discrimination." *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30,142 (May 19, 2020).

179.   The Department of Education has emphasized that, "any person can be a victim, and any person can be a perpetrator, of sexual harassment, and like the Title IX statute itself, these final regulations are drafted to be neutral toward the sex of each party." *Id.*

180.   BU chose to withhold the more precise, clear, and understandable definition of "sexual harassment" in BU's Post-August 14, 2020 Policy to ensure it could more easily find Doe "responsible" and reflects BU's gender-biased treatment against respondents.

181.   The February 2 NOIA also confusingly advised Doe that the allegations for the differing time periods would be analyzed according to *two different sets of procedures*, with confusingly similar names, stating that: "Conduct alleged to have occurred before August 14, 2020" would be analyzed according to "the Procedures for Resolution of Sexual Misconduct Complaints Against Faculty, Staff, Affiliates, and Non-Affiliates [the **Pre-August 14, 2020 Procedures**]," and that "conduct alleged to have occurred on or after August 14, 2020" would be analyzed according to "the Procedures for the Resolution of Title IX Sexual Misconduct Complaints Against Students, Faculty, and Staff [**the Procedures**]."

182.   It was procedural error for BU to apply the Pre-August 14, 2020 Procedures to any portion of Roe's Complaint.

183.   Unlike the Procedures, the Pre-August 14, 2020 Procedures fail to provide the due process protections and fundamental fairness required under the 2020 Title IX Regulations. As just one example, under the Pre-2020 Procedures, the investigator issues a written determination regarding responsibility.

184.   Notwithstanding that BU chose to apply the definition of "sexual harassment" under its obsolete Pre-August 14, 2020 Policy, BU was obligated to afford Dr. Doe the procedural protections and fundamental fairness set forth in the 2020 Title IX Regulations, *see* 34 C.F.R. §§ 106.44(b)(1),106.45, and incorporated in the Procedures.

### H. *During the Investigation, BU Helps Roe Correct Factual Discrepancies in Her Formal Complaint Against Dr. Doe.*

185.    On February 15, 2022, Nagle sent another updated "notice of investigation and allegations" (the "February 15 NOIA"), advising Dr. Doe that Roe had made additional allegations.

186.    It was evident from the February 15 NOIA that Roe had revised some of her allegations in her initial January 23, 2022 "formal complaint" to correct clear factual problems.

187.    For example, Roe revised the dates of alleged harassment to account for time that she was not in the office (during COVID).

188.    Roe also revised her allegation that Dr. Doe had "retaliated" against her by "removing her name" as an author on two publications. She now claimed that Dr. Doe had retaliated against her by "not *including* her name as a co-author."

189.    Though factual discrepancies should have raised doubt regarding the veracity of Roe's claims, the EOO proceeded against Dr. Doe and assisted Roe in revising her claims.

190.    BU's assistance in helping Roe fix the obvious holes in her complaint during the investigation violated Dr. Doe's right to a fundamentally fair and equitable grievance procedure.

### I. *BU Conducts Biased and Unfair Investigation and Denies Dr. Doe's Right to Access and Review Information and Evidence.*

191.    Throughout the EOO's investigation into Roe's allegations, Dr. Doe fully and actively participated in an effort to demonstrate his innocence of the claims made by the so-called anonymous Complainant ("Complainant 1") and Jane Roe ("Complainant 2").

192.    Dr. Doe appeared for four interviews with the investigators and provided documentary evidence to support his assertions of his innocence of the allegations.

193.    During the investigatory interviews, Dr. Doe set forth a clear and consistent account of the collegial relationship between himself and Roe.

194.    On February 8, 2022, Dr. Doe and his Advisor, Charles Z. Schalk, Esq. ("Advisor Schalk" or "Schalk") inquired about the exchange of information guaranteed to him under BU's published policies and procedures and requested to submit documents for the investigators' consideration and an opportunity to review the "evidence, statements, and meeting notes" provided to the investigators.

195.    On February 9, 2022, Investigator Sanghavi emailed Dr. Doe stating he could send the investigators documentation in advance of the interview, but denied his request to review and respond to evidence, and cited Section XII.B.3 of the Procedures.

196.    Investigator Sanghavi's response was erroneous and misstated the appliable policy. In fact, under Section III of the Procedures, Dr. Doe was entitled "[t]o inspect, review, and respond to evidence during the investigation and prior to completion of the investigative report."

197.    Under Section XII.B.3 and XII.B.4 of the Procedures, Dr. Doe was guaranteed an opportunity to inspect and review the evidence during and prior to the completion of the investigation, and was also entitled to review the evidence "in electronic format or a hard copy" prior to the completion of the investigative report, and further entitled to an opportunity to submit a written response to the investigator within 10 days of being provided a copy of the evidence.

198.    Dr. Doe's right under the Procedures to review and inspect any evidence obtained as part of the investigation were also provided for under the 2020 Title IX Regulations. *See* 34 C.F.R. § 106.45(b)(5)(vi).

199.    Despite the investigators' denial of Dr. Doe's rights to review and inspect the evidence against him during the investigation, and their misrepresentation of his rights under the

Procedures, on February 16, 2022, Dr. Doe responded to the investigators' February 9, 2022, email by sending them documents "to assist in [their] investigation."

200.    On information and belief, BU's investigators only interviewed one of the two lab employees who worked with Roe during her employment at BMC.

201.    At the very end of BU's investigatory process, BU finally permitted Dr. Doe to view the evidence online, over BU's secure server, but gave him only a very short period of time in which to review the evidence which was inadequate to prepare for his administrative hearing.

### J.  BU Conducts a Biased and Unfair Hearing.

202.    On May 20, 2022, BU conducted a hearing into the allegations set forth against Dr. Doe by Complainant 1 and Complainant 2.

203.    Brett Sokolow ("Sokolow" or "Chairperson Sokolow"), was a paid BU consultant, who served as the Hearing Chairperson over the objections of Dr. Doe on the basis of Sokolow's bias and lack of impartiality.

204.    Specifically, Sokolow had taken an active role in the investigation. Prior to the hearing, he communicated directly with witnesses and made decisions as to who would testify and the order of their testimony.

205.    Sokolow, along with BU faculty members, Shea Cronin, and Kimberly Saudino, comprised the three-member Hearing Board.

206.    Although the anonymous complaint against Dr. Doe should have been dismissed long before the hearing, as no complainant was ever identified, during the hearing, the Hearing Board asked witnesses if they were the "anonymous" complainant. Every witness denied being the "anonymous complainant."

36.

207.    Roe's prevaricating and inconsistent testimony should have raised doubts as to her credibility and veracity.

208.    For instance, at the Hearing, as in her initial Complaint, Roe claimed that Dr. Doe *"removed"* Roe's name as an "author" from two articles for which she provided research assistance, in "retaliation" for resigning from her job.

209.    After Dr. Doe provided unrefuted testimony that Roe had been appropriately acknowledged and credited for her technical contribution in the two research articles in accordance with NIH guidelines for authorship and the International Committee of Medical Journal Editors' recommendations, Roe modified her earlier complaint to state that Dr. Doe had *"not included"* her as an author.

210.    Roe's testimony at the Hearing also revealed that she had lied to Boston Medical Center about the number of hours she worked while in its employ.

211.    In her testimony, Roe contradicted her own allegations when she admitted that Dr. Doe had acted *very kindly and nic*e to her in the lab and stated that, if he ever physically touched her in some manner, it was *inadvertent and not calculated.*

212.    In violation of the Procedures, the Hearing Board improperly considered hearsay testimony and character evidence from Roe's female witnesses, who had no knowledge of the allegations, including two women *who were never employed in Dr. Doe's lab while Roe worked there*. Consequently, BU relied on impermissible character evidence and hearsay to improperly make a finding against Dr. Doe.

213.    At the hearing, the Hearing Board considered no exculpatory evidence or testimony from the two senior lab employees who worked with Roe during Roe's employment with BMC,

and who would have been able to provide testimony relevant to the allegations and could have attested that the alleged physical interactions between Roe and Dr. Doe never occurred.

214.    Instead, the Hearing Board relied on a substantial amount of conflicting hearsay, irrelevant character evidence, and the self-serving testimony of Roe.

### K. Chairman Sokolow Releases the Hearing Board's Erroneous Findings and Conclusions in a Title IX Hearing Report.

215.    On May 26, 2022, Chairperson Sokolow released a written decision (the "Title IX Hearing Report"), that he prepared on behalf of the Hearing Board.

216.    The Hearing Chairman wrote:

There were two complaints filed in this matter, and [Jane Roe's] complaint was the second. She is thus considered Complainant #2 in this process. Complainant #1 did not come forward in an identifiable way during the investigation and the investigation and hearing process did not discover the identity of Complainant #1.

217.    Chairman Sokolow repeatedly referred to Roe as "Complainant #2" in the Title IX Hearing Report.

218.    That the Hearing Board considered the anonymous complaint and erroneously presumed that there were two complainants—*something that BU never established during its investigation*—was prejudicial to Dr. Doe and deprived him of his rights to a fair proceeding and a presumption of innocence.

219.    By applying two different policies to evaluate Dr. Doe's alleged conduct, the Hearing Board illogically found that Dr. Doe was both responsible and not responsible for "sexual harassment" based on substantially the same conduct.

220.    The Hearing Board found: (1) that Dr. Doe's alleged conduct that occurred prior to August 14, 2020, met the vague and overbroad definition of "sexual harassment" under the obsolete Pre-August 14, 2020 Policy; and (2) Dr. Doe's alleged conduct that occurred after August

14, 2020 did not meet the clearer and more precise definition of "sexual harassment" under the Post-August 14, 2020 Policy.

221.    Whereas the Pre-August 14, 2020 Policy enabled a female complainant to prove her case against a male respondent by merely *asserting* that she subjectively found the respondent's "conduct to be *"unwelcome,"* the Post-August 14, 2020 Policy required the complainant to demonstrate conduct that "a *reasonable person* would determine to be so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the University's education program or activity."

222.    The Hearing Board found each of Roe's allegations of conduct that allegedly occurred prior to August 14, 2021, which it evaluated under the defunct policy definition of "sexual harassment," to be "*unwelcome because Complainant asserted it was unwelcome conduct.*" Under the obsolete policy definition, the Hearing Board *simply believed* Roe's allegations.

223.    Reflecting the gender-bias in Dr. Doe's Title IX proceeding, BU chose to withhold the clearer, more precise definition of "sexual harassment" in its post-August 14, 2022 Policy solely to ensure that BU could hold Dr. Doe accountable for Roe's allegations.

224.    Chairperson Sokolow made credibility findings in favor of Roe and against Doe that were contrary to the weight of the evidence and blatantly biased and unfair.

225.    Notably, Chairperson Sokolow brushed off evidence demonstrating Roe's lack of credibility and veracity with the unsupported conclusion: "***there is no reason in evidence why Complainant or the other witnesses would have made these allegations if they were not true.***" (sic) This conclusory statement ignored both: (a) that this was not the proper standard to evaluate the Complainant's allegations; and (b) Dr. Doe's extensive evidence of the Complainant's possible motivations for retaliation.

226.   The Hearing Board found all of Roe's witnesses, who could only provide hearsay testimony and impermissible character evidence, to be "*exceptionally credible.*"

227.   With respect to the two employees who actually worked with Roe while she was an employee in Dr. Doe's lab and could have provided relevant and exculpatory testimony that Dr. Doe had never sexually harassed Roe, Chairman Sokolow noted in the Title IX Hearing Report that one "declined to attend" and the other "did not respond to the invitation to attend."

228.   The Title IX Report indicates that the Hearing Board considered no exculpatory evidence or testimony by these two employees with relevant, first-hand information.

229.   Chairman Sokolow had communicated with witnesses prior to the hearing to arrange their testimony. Upon information and belief, the Chairman sought to avoid considering evidence and testimony that would have exculpated Dr. Doe.

230.   With respect to Roe's allegations that Dr. Doe had expressed concern about Roe's personal health issues, the Hearing Board ignored exculpatory, relevant evidence of Roe's inappropriate behavior, including that Roe had prompted Dr. Doe's questions by inappropriately texting him information relating to her IUD and an ovarian cyst. The Title IX Report does not even mention this exculpatory evidence, which demonstrates that Dr. Doe's questions were intended to be solicitous about Roe's welfare, not sexual in nature, and simply accepted Roe's assertion that she found this conduct, "unwelcome."

231.   The Hearing Board overlooked evidence directly refuting Complainant's credibility, when Chairperson Sokolow deemed it "especially compelling that Complainant demanded that Respondent stop many of these behaviors as a condition of her willingness to stay on in the lab…" In fact, while the Complainant claimed to have made "an official request regarding changes in [Dr. Doe's] behavior" by email in July or August of 2020, neither a search of Dr. Doe's

own emails nor a search of BU's server were able to locate any such email from the Complainant. Notwithstanding, this fabricated request was deemed reliable evidence by the Hearing Board, to find in Complainant's favor.

232.    The biased and discriminatory nature of the Board's credibility determinations are further reflected in Chairperson Sokolow's remark that, "Respondent's denials were often *vague (or even unintelligible)*, whereas Complainant was *cogent, detailed*, and as a former employee, has no reason to make allegations about Respondent unless they are true."

233.    Dr. Doe, a world renowned scientist and scholar, speaks clear, precise, impeccable, and slightly accented English, reflecting his first language, Bengali.

234.    That Chairperson Sokolow referred to Dr. Doe's testimony *as "vague (or even unintelligible),"* and negatively compared it with Roe's testimony, which he described as *"cogent" and "detailed,"* reflects Sokolow's bias against Dr. Doe's race, color, and/or national origin.

235.    The Hearing Board also considered both Dr. Doe's *age and sex* to be factors when evaluating Roe's claims against Dr. Doe.

236.    Chairperson Sokolow repeatedly emphasized in the Title IX Hearing Report the Complainant's status as *"a young female employee"* and Doe's status as a *"much older,"* male employee (e.g., *"Complainant demonstrated grit and resilience in bringing allegations against a much older, former supervisor"*).

237.    The Hearing Board irrationally attributed to Dr. Doe's gender-neutral conduct, (such as calling employees to check on the lab during the evening, conduct which Dr. Doe engaged in with male and female employees, alike), a sexualized motive because of Dr. Doe's age and gender. Chairman Sokolow emphasized in the Title IX Hearing Report that, even though Dr. Doe

had exhibited *the same conduct to his male employees*, the conduct was "of a sexual nature" when directed at Roe because she was a *"young female employee."*

238.    Based on preconceived and stereotypical notions concerning Dr. Doe's age and gender, the Hearing Board concluded that, because Dr. Doe, was an *older, male employee*, his innocuous, gender-neutral conduct of telephoning Roe at the lab to discuss work—something Dr. Doe did with all employees, both male and female employees alike—"had the effect of creating a hostile or stressful working environment for [Roe] that was likely to limit or deny her ability to work, and in fact did so."

239.    In fact, Dr. Doe provided phone logs that disproved Roe's allegation that Dr. Doe made frequent phone calls at night to her. Also, the phone logs demonstrated that Dr. Doe made more phone calls to the other two male employees who were working in the lab during the time period that Roe was employed, however this irrefutable evidence was ignored by the Hearing Board.

240.    The Hearing Board also accepted as true Roe's false claims that the traditional wedding dress Dr. Doe purchased for her to attend his son's wedding was "see-through," and incredibly, ignored *photographic evidence* showing that the *dress was not see-through*.

241.    The Hearing Board also ignored evidence demonstrating that Dr. Doe's conduct was gender-neutral, including evidence that he had invited several individuals, including a male research assistant, and an Indian post-doc fellow (and his family) who worked in the laboratory, to his son's traditional wedding, and that in advance of the wedding, Dr. Doe and his wife traveled to India to purchase traditional Indian clothing for several of his guests—male and female, as well as a traditional Indian shirt (*punjabi*) for the research assistant.

242.    The Hearing Board deemed Dr. Doe's sexually neutral conduct in relation to the clothing he purchased for Roe to be of a sexual nature on the basis that Roe was "a young, female employee," and Dr. Doe was an older male.

243.    With respect to Roe's allegation that Dr. Doe had taken her body measurements for the wedding outfit he purchased for her, the Hearing Board ignored evidence that Dr. Doe never touched Roe to obtain these measurements, and that traditional Indian dress requires a measurement from shoulder to knee for proper size, that did not implicate Roe's intimate body parts.

244.    That the Hearing Board accepted Roe's assertion that the gender-neutral conduct of obtaining the distance between her shoulder to knee for the purpose of purchasing her a traditional Indian outfit to wear at his son's wedding was "unwelcome" "sexual harassment" reflects the Hearing Board's gender-bias and its discriminatory animus toward Dr. Doe's race, color, national origin, and/or ethnicity, to which the Hearing Board attributed sexual deviance.

245.    That decision-makers accepted as true Roe's false claims that the traditional wedding dress Dr. Doe purchased for her to attend his son's wedding was "see-through," despite irrefutable photographic evidence showing that it was not, likewise evidences the  discriminatory animus of BU's decision-makers toward Dr. Doe's sex, national origin, race, and/or color as a medium-complected, South Asian male of East Indian descent, and their apprehension of Dr. Doe's perceived foreignness and sexual deviance based on negative cultural and racial stereotypes.

246.    With respect to conduct that Roe alleged occurred on or after August 14, 2020, the Hearing Board illogically found that, though Dr. Doe engaged in substantially the same conduct as he had prior to August 14, 2020, he was *not* responsible for "sexual harassment" under the **Post-**

**August 14, 2020 Policy**, because Roe's allegations, *even if true,* did not meet the Post-August 14, 2020 policy's clearer and more precise definition of "sexual harassment."

### L.  BU Belatedly Dismisses the Anonymous Complaint.

247.    On May 31, 2022, *after* the Hearing Board already considered and presumed the existence of a "Complainant #1," BU notified Dr. Doe that it was dismissing the complaint filed by the purported "anonymous reporter" because BU had been unable to identify Complainant 1.

248.    BU's failure to timely dismiss the anonymous complaint reflects the gender-bias in its Title IX procedures, in which investigators and adjudicators believe even false, unsubstantiated, and anonymous reports of female "survivors" against male "perpetrators.

### M. Dean Antman Issues a Sanction Report Influenced by Sokolow's Bias, Gender Stereotypes, and Discriminatory Animus.

249.    On June 1, 2022, Dr. Karen Antman ("Dean Antman"), Provost of BU's Medical Campus and Dean of the Medical School, issued a "sanction report" in which she recommended terminating Dr. Doe's employment.

250.    To arrive at this sanction, Dean Antman arbitrarily and unfairly relied on conclusions drawn from her own independent investigation, which she conducted outside the scope of BU's published policies and procedures.

251.    Dean Antman's unofficial investigation included her *off-the record discussions* with Hearing Chairperson Sokolow and Dr. Coleman.

252.    Dean Antman's testimony at Dr. Doe's appeal hearing revealed that her recommended sanction was influenced by bias, gender stereotypes, and discriminatory animus toward Dr. Doe's national origin, race, and/or color, age, and gender, and Dean Antman's pre-conceived notions about the Complainant, Roe, whom Dean Antman perceived to be a "vulnerable" *younger female.*

**N.  *Dr. Doe Submits an Appeal Under the Pre-August 14, 2020 Procedures which BU Denies.***

253.    Dr. Doe and his Advisor wished to appeal the Hearing Board's determination of his responsibility and Dean Antman's recommended sanction but were uncertain *which appeal procedures* BU was purporting to apply.

254.    The February 2 NOIA indicated that "conduct alleged to have occurred before August 14, 2020" would be analyzed both under the Pre-August 14, 2020 Policy and Pre-August 14, 2020 Procedures. However, in the Title IX Hearing Report, Chairperson Sokolow indicated that BU would apply the Procedures to his appeal.

255.    Under the Pre-August 14, 2020 Procedures, a party had the right to appeal on the following grounds: (a) insufficient evidence; (b) the disciplinary sanction imposed was disproportionate to the violation of the [Pre-August 14, 2020 Policy]"; (3) new evidence; and/or (4) prejudicial bias.

256.    Under the Procedures, a party could appeal on grounds of: (a) procedural irregularity that affected the outcome of the matter; (b) new evidence; and (c) a conflict of interest or bias.

257.    On June 13, 2022, unclear as to what procedures applied, Dr. Doe submitted his appeal on the grounds outlined in the Pre-August 14, 2020 Policy.

258.    On July 19, 2022, *only after* Dr. Doe had already submitted his post-hearing brief to appeal his dismissal on the grounds available under the Pre-August 14, 2020 Procedures, did BU clarify to Dr. Doe that it was purporting to apply the Procedures. This information was contrary to what BU had advised Dr. Doe in the Feb. 2, 2022 NOIA.

259.    In his appeal, Dr. Doe asserted that: (a) the disciplinary sanction of termination was disproportionate to the alleged violation of the Pre-August 14, 2020 Policy; (b) there was

45.

insufficient evidence to support the Hearing Board's finding and the Hearing Board failed to consider critical evidence; and; (c) there was procedural error, prejudicial bias and irregularity in the proceedings.

260.    Dr. Doe argued that the sanction imposed was disproportionate. Given that the Hearing Board found that the *same or similar conduct did not even violate BU's current policy*, as it did not fall within the meaning of the current definition of "sexual harassment," it was irrationally disproportionate for the Hearing Board to impose the most severe sanction of termination, particularly when Dr. Doe *had no disciplinary history*.

261.    Dr. Doe argued that termination of employment was also not a proportionate sanction even under the old, Pre-August 14, 2020 Policy. Under that policy, Dr. Doe's alleged conduct, if true (which it was not) represented only a minor violation, and was not of the serious nature of listed violations that warranted termination.

262.    Dr. Doe also argued that there was insufficient evidence to support a finding, and that the Hearing Board failed to consider abundant exculpatory evidence demonstrating Dr. Doe's innocence, including, *inter alia*, the following:

a.  Dr. Doe's impeccable employment history with BU;

b.  That Dr. Doe had had approximately 100 lab personnel throughout his more than two-decades at BU, and was never previously the subject of a complaint of any nature, and had received uniformly positive letters from females who recently worked in his lab, including from Jane Roe;

c.  That Dr. Doe's conduct relating to the purchase of a traditional Indian wedding for Roe to wear as a guest to his son's wedding, was gender-neutral, directed at both male and female lab employees;

d.  That Dr. Doe's telephone calls to Roe were gender-neutral and work-related conduct, directed at *male and female* members of the laboratory, alike, with whom Dr. Doe checked in during the evening to discuss work-related events in the lab.

46.

e. That Roe, herself, had prompted Dr. Doe's solicitous questions concerning her health issues by inappropriately texting him personal information concerning her gynecological issues.

263.    Dr. Doe also argued that there were numerous procedural irregularities in the proceedings.

264.    Dr. Doe argued that BU's decision to apply two separate conduct standards and definitions for what constitutes "sexual harassment" under Title IX was procedurally irregular.

265.    Dr. Doe argued that BU's decision to apply an outdated policy concurrently with the current policy constituted a *"selective enforcement mechanism"* that violated Dr. Doe's due process rights because BU applied the old, overbroad, vague policy definition for the sole purpose of ensuring Dr. Doe would not have access to, or benefit of, the current standard with the clearer, more precise definition of "sexual harassment."

266.    Dr. Doe also contended that it was unclear what *procedures* BU purported to follow because BU had different procedures in place for the Pre-August 14, 2020 Policy that it did for the Post-August 2020 Policy, but was purporting to apply both policies concurrently.

267.    Dr. Doe contended BU further violated his procedural rights by relying on impermissible character evidence during the hearing.

268.    Dr. Doe also argued that BU's investigation was procedurally irregular, and that Dr. Doe had been denied an opportunity to inspect, review, and respond to the evidence during the investigation.

269.    However, on June 27, 2022, Dr. Daniel Kleinmann ("Dr. Kleinmann"), BU's Associate Provost for Graduate Affairs, notified Dr. Doe that he denied his appeal in its entirety.

270.    Although BU had purported to analyze Dr. Doe's alleged conduct under the definition of "sexual harassment" set forth in its Pre-August 14, 2020 Policy, which was no longer

in effect, Dr. Kleinmann indicated that he declined to consider Dr. Doe's arguments on appeal that set forth grounds available under the Pre-August 14, 2020 Procedures—including the core issue of the fairness of BU's proposed sanction.

271.    Dr. Kleinmann's refusal to consider Dr. Doe's arguments on appeal was in direct contravention of BU's prior instructions, set forth in the February 2 NOIA, which advised Dr. Doe that the Pre-August 14, 2020 Procedures, including grounds for appeal, would apply.

272.    BU changed the procedures applicable to Dr. Doe's appeal based on BU's gender-biased and discriminatory motive to find Dr. Doe responsible.

> ### O. Violating Dr. Doe's Rights Under the Handbook, the University Simultaneously Commences Termination "For Cause" Proceeding and Issues Dr. Doe a "Notice of Non-Continuance."

273.    On July 19, 2022, Provost Morrison sent written notification to Dr. Doe that BU would commence termination of cause proceedings against him, pursuant to Section B of the Handbook's For Cause Policy, based on the Title IX Hearing Report.

274.    Provost Morrison's letter informed Dr. Doe that "[t]he hearing's sole purpose would be to develop a recommendation of an appropriate sanction as provided in Section K of the Policy."

275.    Provost Morrison's letter advised Dr. Doe that she was recommending the most severe sanction possible, termination, based on the Hearing Board's determination that his "pre-August 2020 conduct met the definition of sexual harassment in place at that time."

276.    Dr. Doe's alleged conduct, even if true, did not rise to a violation of BU's current Title IX policy, and also did not represent a serious violation of BU's former policy.

277.    Termination of employment was inconsistent with any prior case of alleged misconduct comparable to Dr. Doe's case.

278.    On July 25, 2022, Dr. Doe confirmed that he wanted to proceed to the formal appeal process outlined in the For Cause Provision of the Handbook.

### i.   Notice of Non-Continuance.

279.    Separate and apart from the "for cause" proceeding, on July 19, 2022, BU issued Dr. Doe a *"notice of non-continuance,"* citing Section C of the Appointments and Promotions Policy in the Handbook.

280.    The notice of non-continuance was signed by Alan Farwell, M.D., Section Chief, Section of Endocrinology and Dr. Coleman, and approved by Dean Antman.

281.    The "notice of non-continuance" forewarned Dr. Doe that even if he prevailed on the appeal of his "for cause" termination, BU intended to discontinue his decades-long rolling appointment, stating:

> As you know, Boston University has initiated a termination of your faculty appointment for cause which is detailed in separate correspondence. ***If you appeal this decision and are successful in your appeal, we write to notify you of a change in your employment and appointment in the Department of Medicine.***

(Emphasis added.)

282.    The "notice of non-continuance" advised Dr. Doe that his faculty appointment would end at the conclusion of three years, with a winding-down in years two and three, in which his salary would be reduced to 80 percent of its value, with termination of his employment and faculty appointment at the conclusion of three years, effective July 17, 2025.

283.    BU also informed Dr. Doe that the research space he currently occupied (including his office and laboratory facilities), could be reassigned at the Chair's discretion.

284.     In violation of the Handbook's Appointment Policy, BU intended not to continue Dr. Doe's appointment at the end of his three-year term of his appointment, despite that his exemplary performance had at all relevant times exceeded BU's institutional needs and goals.

### P. After a Three-Month Delay, BU Schedules Dr. Doe's Formal "For Cause" Proceedings Under Section B of the Handbook.

285.     Dr. Doe informed Provost Morrison that he wished to participate in a "for cause" proceeding.

286.     After waiting for three months for a response from the University, Dr. Doe received notice on October 19, 2022, that he needed to re-submit confirmation to Provost Morrison.

287.     On October 26, 2022, Dr. Doe submitted a written statement to Provost Morrison, reiterating his request for a hearing.

### Q. Dr. Doe's Hearing on January 12, 2023 Before the Faculty Hearing Committee.

288.     On January 12, 2023, Dr. Doe appeared before the "Faculty Hearing Committee."

289.     The Faculty Hearing Committee consisted of the following members: (a) Arianne Chernock, Professor of History and Associate Dean of the Faculty for the Social Sciences and the College of Arts and Sciences, who served as Chair; (b) Ellen Devoe, Professor and Associate Dean of the School of Social Work; (c) James Fleming, Professor of Law; (d) G. Sujin Pak, Professor and Dean of the School of Theology; and (e) Timothy Simcoe, Professor in the Questrom School of Business.

### i.     Testimony of Dean Karen Antman and Professor David Coleman.

#### a.    Dean Antman's Recommended Sanction Was Based on Preconceived Notions, Biases, and Gender Stereotypes.

290.     Dean Antman testified as a witness for the Office of the Provost. Dean Antman's testimony revealed that she had arrived at the recommended sanction of termination in her June 1, 2022, sanction report based on her reliance on the Hearing Board's erroneous report and her own personal biases.

291.     Dean Antman had never spoken with Dr. Doe about the allegations against him.

292.     Dean Antman testified that she had recommended the sanction of termination due to Dr. Doe's purported "pattern" of misbehavior and her erroneous belief—based on no material facts in evidence—that he had allegedly used a position of power to his advantage.

293.     Other than Roe's single complaint involving only one complainant (Roe), Dr. Doe had an *unblemished record during more than 24 years of employment at BU,* and had never received a complaint of sexual misconduct during his entire employment or during his time as a student at BU.

294.     In her inconsistent and prevaricating testimony, Dean Antman suggested that Dr. Doe's alleged sexual harassment demonstrated a recurring "pattern" of behavior which justified the disproportionate, discriminatory, and biased sanction that she recommended in her sanction report.

295.     However, under cross-examination, Dean Antman acknowledged that throughout Dr. Doe's entire employment history at BU, there had been only one complaint of alleged sexual misconduct filed against Dr. Doe, and that was the complaint filed by Roe.

296.    Shockingly, Dean Antman testified that, in arriving at her recommended sanction of termination, she had simply ***"guess[ed]…that there may be more"*** complaints against Dr. Doe.

297.    However, the record contains no evidence of any other complaints against Dr. Doe to support Dean Antman's presumptive *"guess."*

298.    Dean Antman also exhibited her bias and prejudice against Dr. Doe in testimony in which she attempted to falsely depict Dr. Doe as someone who underpaid his employees.

299.    Dean Antman's statements concerning Dr. Doe's purported underpayment of employees were not only false but entirely irrelevant to the facts in evidence.

300.    In her testimony, Dean Antman opined to the Appeal Board that Roe had been in a *"vulnerable"* position.

301.    Dean Antman attributed Ms. Roe's purported vulnerability to Ms. Roe's former employment as a server, prior to working in Dr. Doe's lab as a research assistant.

302.    Dean Antman testified that, she, herself, had "waited tables, too," and that she had been "very" vulnerable at the time.

303.    With no factual basis in the record, Dean Antman concluded that Ms. Roe was "vulnerable" based on her own personal experience as a waitress which she projected onto Roe, not on any material fact in evidence.

304.    Dean Antman never spoke with the Complainant or otherwise established that her assessment was an accurate assessment of the Complainant.

305.    Just as Dean Antman had made biased assumptions against Dr. Doe by *guessing* that there were other complaints against him, Dean Antman made a baseless assumption about Ms. Roe's purported vulnerability.

306.     In her testimony, Dean Antman attempted to further support her theory that Dr. Doe recurrently takes advantage of vulnerable people by referencing a situation regarding a post-doctorate's housing situation that occurred a decade ago.

307.     Though this housing situation was irrelevant to the allegations in the Complaint and the facts in the record, Dr. Doe addressed it in his testimony.

308.     Dr. Doe testified that he had offered to let a post-doctorate researcher and his wife, whose housing situation fell through at the last minute, to stay in an apartment close to the lab.

309.     Dean Antman's conclusions about Dr. Doe were based on nothing more than her own preconceived notions and biases.

### b. Dean Antman's Improper Investigation and Ex Parte Conversations with Chairperson Sokolow and Dr. Coleman.

310.     Dean Antman testified that the procedures required her to rely on the Hearing Board's Title IX Hearing Report to make her recommended sanction.

311.     However, Dean Antman did not solely rely on the Title IX Hearing Report, and she conducted her own investigation by speaking with Hearing Chairperson Sokolow and Dr. Coleman.

312.     Dean Antman never once spoke with Dr. Doe about the allegations against him.

313.     Although Dean Antman acknowledged in her testimony that BU's "procedure is that I rely on the report" she did not do so.

314.     Incredibly, contrary to BU's published procedures and policies, Dean Antman testified that, "we do our own investigation and our own sanctions independent of the EEO," and that "we have expectations for people's behavior . . . in addition to those of the EOO."

315.     Dean Antman pointed to no public statement expressing purportedly higher standards than those set forth in BU's Faculty Handbook or putting the faculty on notice of them.

316.   Dean Antman testified that, she spoke with Chairperson Sokolow, and that he "was pretty adamant about this being a real problem[,]" that he believed the behavior "wouldn't stop[,]" and that it was "impactful on the people in . . . the lab."

317.   Dean Antman testified that Chairperson Sokolow had told her that he did not believe that Dr. Doe had expressed remorse for his actions.

318.   In her testimony, Dean Antman erroneously asserted that Dr. Doe had engaged in a "pattern" of behavior and that she believed that there had been a "second complaint" of alleged sexual misconduct against Dr. Doe, ***and that the complainant "wouldn't come forward."*** Dean Antman's testimony reflects the prejudicial presumptive statements and comments made in the Title IX Hearing Report by Sokolow, including his repeated references to Roe as "Complainant #2."

319.   Again, the only identified complainant against Dr. Doe was Roe. There was no record or evidence establishing the existence of a second complainant who "wouldn't come forward."

320.   Dean Antman also testified that she consulted with Dr. Coleman for his opinion before arriving at her unsubstantiated conclusions and recommended sanction.

321.   Dr. Coleman, who was Chair of BU's Department of Medicine during the relevant period, had placed Dr. Doe on unwarranted administrative leave on January 27, 2022, as a result of Ms. Roe's Complaint, without once speaking with Dr. Doe about the allegations.

322.   Dr. Coleman, as Chair of the Department, participated in the decision-making process regarding the sanction recommended by Dean Antman and adopted by Provost Morrison.

323.   Dr. Coleman's opinion was infected with the same prejudice, bias, and discriminatory animus as that of Dean Antman.

324.     Dr. Coleman testified at the hearing on behalf of the Office of the Provost.

325.     Dr. Coleman's testimony revealed that, when the EEO proposed that Dr. Doe be placed on administrative leave, BU did not act out of concern that Dr. Doe's conduct presented a threat to the safety of Roe or the campus community.

326.     Dr. Coleman testified that *he believed* Dr. Doe violated the applicable BU policies, and that he held this belief without ever speaking with Dr. Doe.

327.     Dr. Coleman testified that he had consulted with Chairperson Sokolow to get more information from him about the substance of the Title IX Hearing Report, and the rationale behind the Hearing Board's findings and conclusions.

328.     Like Dean Antman, Dr. Coleman testified that he relied on Sokolow's findings and conclusions, including Sokolow's credibility assessments, to form an opinion as to Dr. Doe's credibility.

329.     Lacking any factual basis, Dr. Coleman's opinion as to Dr. Doe's culpability was based on his own bias and pre-conceived notions.

330.     Dean Antman's purported investigation of the allegations was fundamentally unfair because she never once spoke with Dr. Doe about the allegations, who was the subject of the investigation, and she relied on the equally biased opinions of Sokolow and Dr. Coleman.

331.     Dean Antman's ex parte conversations further deprived Dr. Doe of a presumption of innocence and a fair and equitable opportunity to demonstrate his innocence and support his good character.

### c.  BU's Recommended Sanction Against Dr. Doe was Grossly Disproportionate and Constituted Disparate Treatment.

332.     In her testimony, Dean Antman could not reference any other professor who had been terminated for cause as a result of sexual misconduct except for one, David Marchant, who

BU terminated in 2019, after he was found to have been "highly abusive and sexist to graduate students and others."

333.    In 2019, BU terminated the employment of David Marchant, a white male professor of European ancestry, for sexual misconduct based on substantially more serious allegations than those against Dr. Doe.

334.    Marchant's misconduct case had involved multiple complainants, more than 30 witnesses, and 1,000s of pages of records, and were even the subject of a separate investigation by the U.S. House of Representatives Committee on Science, Space, and Technology. *See* https://www.insidehighered.com/news/2017/11/20/boston-u-moves-terminate-professor-after-investigation-sexual-harassment-claims.

335.    Unlike Dr. Doe's case, in Marchant's case, there were substantiated allegations of *"direct physical attacks, and other types of psychological and physical abuse."*

336.    Moreover, in Marchant's case, unlike Dr. Doe's case, the University applied a higher standard of proof of sexual harassment, not the merely "unwelcome" conduct standard BU applied in Dr. Doe's case.

337.    In Marchant's case, BU required the claimants against him to demonstrate evidence that "the sexual harassment was *sufficiently severe and pervasive* so as to create a hostile learning and living environment" for a graduate student during a research field expedition to Antarctica. *See* Provost Morrison's letter dated Nov. 17, 2017, available at: https://www.boston.com/news/local-news/2017/11/18/heres-the-letter-to-bu-faculty-about-a-geology-professors-violation-of-the-sexual-harassment-policy/ (last visited Aug. 24, 2023) (emphasis added).

338.     Dean Antman admitted in her testimony that there *had never been a case of alleged sexual misconduct comparable to Dr. Doe's case in which she had recommended termination*.  She also conceded that Dr. Doe had never previously been accused of sexual misconduct in his 24 years of employment at BU.

### R.  In Furtherance of His Appeal, Dr. Doe Submits His Post-Faculty Hearing Brief.

339.     On January 23, 2023, Dr. Doe submitted his post-hearing brief to Chairman Chernock.

340.     Dr. Doe argued that termination of his appointment would be wrong based on the following reasons: (a) there was no basis for Dean Antman's belief that his alleged conduct toward Roe was part of an alleged pattern of misbehavior; (b) Dean Antman's testimony showed that her recommended sanction of termination was based on her own biases, as well as the preconceived notions and biases of those whose opinions she consulted, namely, Dr. Coleman and Chairperson Sokolow; (c) Dean Antman had conducted an improper investigation outside of the scope of BU's applicable policies and procedures which resulted in the aforementioned biased decision; and (d) the sanction Dean Antman recommended was grossly disproportionate.

### S.  A Majority of the Faculty Hearing Committee Recommends that Dr. Doe be Suspended for the Remainder of His Appointment.

341.     On February 1, 2023, the Faculty Hearing Committee dispensed a split decision (the "Faculty Hearing Committee Report") concerning Dr. Doe's status at BU, with a majority of three committee members recommending suspension for the duration of Dr. Doe's appointment and a minority of two committee members recommending termination.

342.     The majority of the Faculty Hearing Committee reached its decision in reliance on the erroneous findings of the Hearing Board, contained in the Title IX Hearing Report, and the

Faculty Hearing Committee's own biased and unsupported conclusion that Dr. Doe was unable or unwilling to "adjust his behavior."

343.    Under Section F of the For Cause Provision of the Handbook, the Faculty Committee was required to recommend a sanction that was proportionate to the alleged conduct.

344.    In the Faculty Committee Hearing Report, the Faculty Committee articulated that it understood its obligation under the For Cause Provision of the Handbook to determine the proportionality of the sanction based on  three factors: *"(1) whether the sanction is proportional to the gravity of the Written Determination Report's finding of a violation; (2) whether the sanction is proportional to those meted out in other cases of sexual misconduct at [BU]; and (3) whether the sanction is proportional to those given in known cases of sexual misconduct at other universities."*

345.    However, at the Faculty Committee Appeal Hearing, the Faculty Committee had in its possession only the erroneous Report of the Hearing Board; it received no information or evidence from its witnesses about the nature of other cases involving alleged sexual misconduct, either at BU or at other universities or medical schools, or the sanctions meted out in such cases.

346.    It was therefore impossible for the Faculty Committee to apply the required three factors relevant to the proportionality of the sanction when it arrived at its recommendation to suspend Dr. Doe for two years without pay.

### T.  BU's President Rejects the Decision by the Majority of the Faculty Hearing Committee to Suspend Dr. Doe's Appointment and Instead Recommends Dismissal.

347.    Pursuant to Section G of the For Cause Provision of the Handbook, BU forwarded the findings dispensed in the Faculty Committee Report to BU President Brown for consideration.

348. On February 21, 2023, President Brown notified Dr. Doe that he "decided to reject the recommendation of the three members of the Faculty Hearing Committee, as [he] believe[ed] the appropriate sanction in this matter is termination of [Dr. Doe's] faculty appointment."

349. President Brown advised Dr. Doe that, in making his recommendation, he had reviewed *inter alia*, the biased Title IX Hearing Report. President Brown noted that pursuant to Section H of the For Cause Provision of the Handbook, his recommendation to terminate Dr. Doe's employment would be transmitted to the Board of Trustees for consideration.

### U. The Trustees Vote to Terminate Dr. Doe's Appointment, "for cause," effective April 30, 2023.

350. Following a vote by the Trustees on March 14, 2023, on March 16, 2023, President Brown notified Dr. Doe that the Trustees had voted to terminate Dr. Doe's faculty appointment, "for cause," and that Dr. Doe's employment at BU would end effective April 30, 2023.

351. Dr. Doe's appointment as a full-time professor terminated, effective April 30, 2023.

352. Pursuant to Section H of the For Cause Policy, the decision of the Board is final, leaving Dr. Doe with no further option to appeal the matter.

### VI.    Pretext and Discriminatory Animus.

353. Defendants' purported justification for Defendants' termination of Dr. Doe's employment was a pretext for unlawful discrimination, as evidenced by Defendants' deviations from BU's policies and procedures.

354. Defendants' purported "cause" for Dr. Doe's termination of employment was misconduct that, even if true, which it was not, amounted to a minor violation of BU's former (defunct) policy.

355. Dr. Doe's alleged conduct, even if true, which it was not, did not rise to a violation of BU's current Title IX policy.

356.    Defendants intentionally discriminated against Dr. Doe by terminating his employment, a grossly disproportionate sanction under BU's own policies and procedures, and in conflict with BU's normally followed principles of "proportionality" in disciplinary actions.

357.    That Defendants' purported justification for terminating Dr. Doe's employment was a pretext for discrimination is evidenced by the "notice of non-continuance," which shows that Defendants intended to terminate Dr. Doe's employment even if he prevailed in his formal "for cause" proceeding, and despite that Dr. Doe did not meet the criteria for non-continuance under the Handbook.

358.    Evidence of pretext is also provided by BU's decision to place Dr. Doe on an administrative leave, which imposed a significant burden on his ability to perform his work, without conducting the requisite prior analysis or determining that removing Dr. Doe from campus was necessary to protect the health and safety of Roe or any individual, as required by BU's own policies and procedures.

359.    Dr. Doe's status as a South Asian male of East Indian origin, aged 63, was a determinative factor in Defendants' placement of Dr. Doe on administrative leave for more than a year, and on Defendants' grossly disproportionate sanction of termination.

360.    On information and belief, Defendants have not terminated female employees on similar grounds without following their own policies and procedures.

361.    On information and belief, Defendants have not terminated employees younger than Dr. Doe and outside of the age range protected under applicable law on similar grounds without following their own policies and procedures.

362.    The imposition of Dr. Doe's placement on administrative leave without even apprising him of the allegations against him, and the subsequent imposition of the sanction of

termination against Dr. Doe's employment, without any opportunity to remediate any purported deficiency or problem in his conduct, represent further violations of Defendants' policies and procedures, including, *inter alia,* the Post August 2020 Policy, the Procedures, and the For Cause Provision of the Handbook, and provides yet more additional evidence that Defendants' actions were a pretext for discrimination.

### VII.     Age and Sex Discrimination.

363.    At the time of his termination, Dr. Doe was 63 years old and was in a protected age class. Defendants terminated Dr. Doe on the basis of being an older male.

364.    Chairman Sokolow considered Dr. Doe's age a factor when evaluating Roe's claims against Dr. Doe. Sokolow and described Dr. Doe "as a much older male" in relation to Roe whom Sokolow referred to as "a young female employee."

365.    In his written decision, Sokolow opined that, "Complainant [Roe] demonstrated grit and resilience in bringing allegations against a much older, former supervisor" and described Roe as "young" in relation to Dr. Doe numerous times.

366.    Sokolow's stereotypical thinking about Dr. Doe's age, and his being an "older male" in relation to Roe's being a "young" female, plainly played a part in BU's decision-making process and in its finding that Doe was responsible for sexual misconduct.

367.    Adverse employment decisions that are made because of stereotypical thinking about people based on their age, whether conscious or unconscious, violate applicable laws prohibiting discrimination.

368.    Stereotypical thinking occurs when an employer categorizes people on the basis of broad generalizations.

369.   Defendants were not free to assume that because Dr. Doe was an older male, that he engaged in sexual misconduct with Roe, a younger female.

**VIII.**    **Race/Color/National Origin Discrimination.**

370.   Dr. Doe is a medium-complexioned, South Asian-American male of East Indian descent and, within a protected class, who at all times performed his position at a level that exceeded his employer's expectations.

371.   On information and belief, Defendants have not terminated white male employees of European ancestry for more serious sexual misconduct.

372.   In or about 2021, when similar accusations of sexual misconduct were made against Assistant Professor Christopher Cavalieri, a white male of European ancestry, Defendants permitted Professor Cavalieri, to continue as a faculty member and did not place him on administrative leave or terminate his employment. *See* https://dailyfreepress.com/2022/04/21/former-current-students-accuse-bu-assistant-professor-christophor-cavalieri-of-sexual-misconduct/.

373.   On information and belief, in or about 2016, when more serious allegations of sexual harassment were made against Professor Eric Ruske, a white male of European ancestry, Defendants did not place Ruske on administrative leave or take disciplinary action against him. Defendants continued to allow Ruske to teach and to remain on campus.

374.   And, when two female students subsequently brought suit in federal district court, accusing both BU and Ruske of violating Title IX, the University rushed to Ruske's defense. *See Shyr v. Trustees of Bos. Univ.*, No. CV 16-11124, 2017 WL 1014999 (D. Mass. Mar. 13, 2017).

375.   On information and belief, when BU later received an anonymous complaint of sexual misconduct against Ruske, Defendants still took no disciplinary action against him.

https://dailyfreepress.com/2021/09/24/second-bu-student-comes-forward-with-evidence-of-inappropriate-online-communication-from-professor-eric-ruske/.

376.    Dr. Doe speaks slightly accented English, reflecting his first language, Bengali. That Chairperson Sokolow referred to Dr. Doe's testimony as "vague or even unintelligible" and compared his testimony negatively to that of Roe, a white female of European ethnicity, which he described as "cogent" and "detailed," reflects Sokolow's discriminatory bias against Dr. Doe's race, color, and/or national origin.

377.    That decision-makers accepted as true Roe's demonstrably false claims of sexual harassment connected with Dr. Doe's innocuous purchase of a traditional Indian wedding dress for Roe to wear as a guest at his son's wedding is further evidence of discriminatory animus by BU's decision-makers directed at Dr. Doe's national origin, race, and/or color as a medium complexioned South Asian male of East Indian decent, and the decision-makers' apprehension of Dr. Doe's perceived foreignness and sexual deviance based on negative cultural and racial stereotypes.

378.    That Dean Antman presumed, with no facts in evidence, that Dr. Doe had a "pattern" of abusive behavior, had taken advantage of "vulnerable people," and "underpaid" employees was based on her preconceived biases, racial and cultural stereotypes, and discriminatory animus directed at Dr. Doe's race, color, and/or national origin.

379.    On information and belief, Roe, BU's Title IX Coordinator, and the overwhelming majority of the key decision-makers in Dr. Doe's Title IX proceeding were white and of European descent, including:

- Nagle, the Title IX Coordinator;
- Elizabeth Sanghavi and Tracy Kennedy (Investigators) – Lawyers from Sanghavi Law Office;

- Hearing Chairperson Sokolow and the two faculty members of the Hearing Board, Shea Cronin, and Kimberly Saudino;
- Dr. Coleman, then Dr. Doe's department Chair, (who placed Dr. Doe on unwarranted administrative leave);
- Dean Antman (who issued the Sanction Report);
- Daniel Kleinmann (who denied Dr. Doe's appeal);
- Provost Morrison (who commenced for-cause proceedings).
- Four of the five members of the Faculty Hearing Committee in Dr. Doe's "for cause" proceeding:  Arianne Chernock, Ellen Devoe, James Fleming, and Timothy Simcoe. On information and belief, the fifth committee member, G. Sujin Pak, is a woman of color and of Asian descent.
- Robert Brown, then BU's President, who rejected the Faculty Committee's decision to suspend Dr. Doe in favor of terminating his employment.

380.    The fact that Dr. Doe is a medium-complexioned, South Asian-American male of East Indian descent was a motivating factor in the discriminatory treatment and termination of employment that he suffered at the hands of Defendants.

381.    An adverse employment action based in whole or in part on account of race and/or color, ethnicity, and/or national origin constitutes prohibited discrimination.

382.    For the reasons described above, Defendants' conduct constitutes racial, color, national origin motivated and unlawful discrimination under Title VII and Massachusetts G.L. c. 151B.

## IX.    Dr. Doe Has Suffered Immense Injury.

383.    Defendants' intent to discriminate against Dr. Doe on account of his sex, race, color, national origin, ethnicity and/or age is established by the fact that female, white, non-Indian-American employees, and younger employees were treated better than Plaintiff in terms of Title IX investigations and proceedings and for cause disciplinary proceedings.

384.     Dr. Doe has suffered and will continue to suffer significant damage as a result of BU's erroneous finding of responsibility and the resulting sanction of termination of employment.

385.    As a result of BU's gender-biased and flawed investigation, and resulting erroneous and discriminatory decisions to place him on administrative leave for more than a year and then to terminate his employment, Dr. Doe has lost critical research projects and supported funding.

386.    By being unfairly barred from the BU campus for over an entire year after BU placed Dr. Doe on administrative leave at the inception of Roe's complaint, and his exclusion from his work environment while the proceedings commenced, Dr. Doe was unable to conduct his NIH and other private organization's funded research projects, lost specially created and genetically-modified research animals, was unable to receive an additional NIH award (that received a fundable score), lost opportunities to apply for funding, turned down invited lectures and scientific presentations both nationally and internationally, and was unable to meet professional expectations from lab members.

387.    Additionally, Dr. Doe now suffers from health issues, emotional distress, and anxiety.

388.    Finally, due to his wrongful termination from BU on April 30, 2023, Dr. Doe has suffered the loss of income on which he depended for his livelihood. The stigma attached to the employment action also has made it impossible for Dr. Doe to obtain employment elsewhere.

## COUNT I
### Violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.*
### (As to Defendants Boston University and the Trustees of Boston University)

389.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

390.    Title IX of the Education Amendments of 1972 20 U.S.C. § 1681 *et. seq.*, provides, in relevant part, that:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination

under any education program or activity receiving Federal financial assistance.

391.    Title IX applies to all public and private educational institutions that receive federal funding, including Boston University.

392.    Title IX may be violated by a school's failure to remedy sexual harassment, and by a school's imposition of discipline where gender is a motivating factor in the decision. In either case, the statute is enforceable through an implied private right of action. *See Cannon v. Univ. of Chicago,* 441 U.S. 677 (1979).

393.    Title IX requires schools to adopt grievance procedures providing for prompt and equitable resolution of sexual misconduct complaints. *See* 34 C.F.R. § 106.8(b).

394.    Under the 2020 Title IX Amendments, which became effective August 14, 2020, covered educational institutions, including BU, must adopt grievance procedures that afford robust due process and fundamental fairness throughout the investigation, hearing, and appeal phases of a Title IX proceeding. *See* 34 C.F.R. § 106.45.

395.    The First Circuit recognizes the erroneous outcome theory of liability, following the standard articulated by the Second Circuit in *Yusuf v. Vassar Coll.,* 35 F.3d 709 (2d Cir. 1994).

396.    To plead an erroneous outcome claim under Title IX, a Plaintiff found responsible for sexual harassment in a college disciplinary proceeding must allege facts sufficient to: (a) "cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding," and (b) indicate that "gender bias was a motivating factor." *Doe v. Trs. of Bos. Coll.,* 892 F.3d 67, 91 (1st Cir. 2018).

397.    With respect to the first element, Defendants' finding that Plaintiff was responsible for sexual harassment was utterly erroneous. The "pleading burden in this regard is not heavy" and can be met by alleging "particular procedural flaws affecting the proof." *Yusuf*, 35 F.3d at 715.

398.    Facts casting much more than "some articulable doubt" on the accuracy of the outcome are described in detail in the foregoing paragraphs.  By way of example and not limitation, gender bias can be inferred from the following procedural flaws in BU's process:

a.   BU's Title IX Office delayed dismissing a false, purportedly anonymous complaint against Dr. Doe within the 90-day timeframe, and then consolidated the so-called anonymous complaint with Roe's false formal, signed complaint, permitting an unwarranted and prejudicial inference that there was more than one complainant in Dr. Doe's case.

b.   BU's investigators failed to provide Dr. Doe access to evidence and information during its investigation.

c.   Following its receipt of Jane Roe's Formal Complaint on January 23, 2022, BU presumed that Dr. Doe was guilty of the allegations against him, placing him on administrative leave on January 27, 2022, without interviewing him or notifying him of the charges against him, despite that the allegations did not warrant placing Dr. Doe on administrative leave as a reasonable and necessary supportive measure under the criteria of BU policies and procedures.

d.   BU improperly analyzed Roe's complaint under both its obsolete Pre-August 14, 2020 Policy and its current Post-August 2020 Policy, with *two different substantive definitions of "sexual harassment,"* thereby reaching the illogical conclusion that Dr. Doe was simultaneously *"responsible"* and "*not responsible"* for sexual harassment based on identical alleged conduct.

e.   BU arbitrarily terminated Dr. Doe's appointment because of conduct that *does not even constitute Title IX "sexual harassment" or violate BU's applicable sexual misconduct policy.*[7]

f.   The Hearing Board wrongly applied the preponderance of the evidence standard by erroneously finding that Dr. Doe lacked credibility based on nothing more than its acceptance of Jane Roe's *word* over Dr. Doe's.

g.   The Hearing Board failed to secure the testimony or even consider statements of two male witnesses who could have provided exculpatory

---

[7] Indeed, as noted in the foregoing paragraphs, under Section VII.C. of the Procedures, ("Mandatory Dismissal"), "[t]he University must **dismiss** a Formal Complaint (or any parts of the Formal Complaint) at the assessment stage or at any point prior to or during the investigation and hearing" for reasons that include, "if "[t]he alleged misconduct, even if proved, would not constitute *Title IX Sexual Misconduct* as defined in the Sexual Misconduct Policy." Here, the University should have dismissed Roe's Complaint because it did not constitute Title IX Sexual Misconduct under the applicable **Post-August 2020 Policy**.

evidence, (specifically, Jane Roe's co-workers in the lab at the time of her employment).

h.  The Hearing Board wrongfully ignored relevant, exculpatory evidence, resulting in findings of fact and credibility determinations that were incorrect and contrary to the weight of the evidence.

i.  In arriving at a sanction of termination, Dean Antman relied on her own, off-the-record investigation, *outside the scope of BU's published procedures*, by consulting with Hearing Board Chairperson Sokolow and Dr. Coleman for their biased and erroneous opinions about the matter, including her preconceived and erroneous notions about Roe and Dr. Doe, and failed to recommend a remedy congruent and proportional to the alleged violation and in accordance with principles of fundamental fairness.

399.  As alleged in the foregoing paragraphs, gender bias was a motivating factor behind the erroneous findings and the decision to impose an unjustly severe penalty upon Plaintiff, Dr. Doe. Factual circumstances demonstrating gender bias include, without limitation, *inter alia*:

a.  Campus concerns about sexual harassment, expressed in newspaper articles and commentary, exhibited anti-male bias of many members of the BU community, including student groups, exerted pressure on BU to do more to support female "victims" and "survivors" of sexual harassment and to hold male "rapists" and "perpetrators" accountable.

b.  BU rejected application of the 2020 Title IX Regulations, which offered enhanced due process protections for all accused, in all cases of alleged sexual misconduct, and, in Dr. Doe's case, failed to afford procedural protections required under Title IX.

c.  BU rejected application of the 2020 Title IX Regulations with respect to the regulations' more clear and precise definition of sexual harassment, and decided to apply an overbroad and vague definition of "sexual harassment" from an obsolete policy in Dr. Doe's case to ensure BU could hold Dr. Doe "responsible."

d.  BU's decision-makers in Dr. Doe's case, including Provost Morrisson, Dean Antman, and Dr. Coleman, did, in fact, feel pressured by and were influenced by these campus concerns, as evidenced by their words and actions, including:

1)  Provost Morrison's public rejection of the 2017 DCL and her adoption of the overly harsh and punitive sanction recommended by Dean Antman.

68.

2) President Brown's public rejection of the 2020 Title IX Regulations, and his concern that affording gender-neutral due process rights and fundamental fairness in Title IX procedures to both parties, male and female, would deter "victims" from coming forward.

3) Dean Antman's subjective presumptions concerning Dr. Doe and Roe and her unsupported assessment of Roe's "vulnerability" and her recommended sanction of termination, that was overly harsh and also excessive.

4) Dr. Coleman's role in placing Dr. Doe on administrative leave, without any *evidence* that such action was a reasonably necessary "supportive measure" to protect the safety of Roe or the campus community, as required under BU's policies and procedures, and applicable law.

5) BU's decision-makers' unwarranted presumption that an unsubstantiated anonymous complaint constituted evidence of a purported "pattern" of sexual misconduct by Dr. Doe.

6) Chairman Sokolow's emphasis in the Title IX Report that Dr. Doe was an older male and the Complainant was a younger female, evidencing that Dr. Doe's gender was plainly a factor in the Hearing Board's erroneous conclusion that Dr. Doe was responsible, and in the Hearing Board's findings that Dr. Doe's gender-neutral conduct, which had been directed at both male and female employees in his lab, was "harassment" when directed at Roe.

7) That, when on July 19, 2022, BU issued Dr. Doe a notice of non-continuance, thereby informing him that BU intended to terminate his faculty employment within three years, it evidenced its motivation to terminate his lengthy and otherwise unblemished employment *regardless* of the outcome of his appeal.

400.    As a direct and proximate result of Defendants' conduct, Dr. Doe suffered significant, irreparable harm and damages, including, without limitation, emotional and psychological distress, loss of career opportunities, past and future economic injuries, reputational damages, and other direct and consequential damages.

**COUNT II**
**Violation of Massachusetts Gen. L. ch. 151B**
**Discrimination Based on Sex and Gender**
**(As to Defendants Boston University and the Trustees of Boston University)**

401.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

402.    Mass. Gen. L. ch. 151B *et seq.* prohibits an employer from discriminating against an individual on the basis of their gender.

403.    By the conduct alleged in detail above, Defendants, through their agents and/or employees, violated Mass. Gen. L. ch. 151B *et seq.* by subjecting Plaintiff to disparate treatment and disparate discipline on the basis of his gender.

404.    To establish a claim for discrimination under Mass. Gen. L. ch. 151B, a plaintiff must first demonstrate that: (i) plaintiff is a member of a protected class; (ii) plaintiff performed the job satisfactorily; and (iii) plaintiff suffered an adverse employment action. *See Sisco v. DLA Piper LLP,* 833 F. Supp. 2d 133, 148 (D. Mass. 2011) (internal quotations omitted). The "initial burden is not an onerous one." *Id.* An inference arises that the protected class characteristic served as a determining factor. *Id.*

405.    Plaintiff is a member of a protected class because he is a male.

406.    During his 24-year career as a professor at BU, Plaintiff performed the duties required by his position in a satisfactory manner. Dr. Doe is a world-renowned scientist, has received numerous awards for his contributions to his field, and between 1986 and 2022, Dr. Doe authored or co-authored 100 articles published in scholarly, peer-reviewed medical journals, including seventeen articles published between 2019 and 2022, alone. Moreover, Dr. Doe supervised approximately 100 lab personnel, including non-student research assistants employed

by BU, mentored numerous medical students, graduate students, and undergraduate students, and was named the 2006 "Mentor of the Year" by BU.

407. Plaintiff suffered an adverse employment action when BU terminated Plaintiff's decades-long rolling appointment as a full-time professor "for cause," effective April 30, 2023.

408. Further, as described above at ¶¶ 352-361, Defendants' purported justification for Defendants' termination of Dr. Doe's employment was a pretext for unlawful discrimination, as evidenced by Defendants' deviations from BU's policies and procedures.

409. Upon information and belief, BU still employs professors of comparable qualifications to Plaintiff.

410. The discrimination suffered by Plaintiff while employed by BU severely affected the terms and conditions of his employment as he was terminated as of April 30, 2023, effectively ending his career.

411. As a direct and proximate result of the foregoing, Plaintiff did suffer and continues to suffer substantial damages, including without limitation, emotional and psychological distress, loss of career opportunities, past and future economic injuries, reputational harm, and other direct and consequential damages.

412. Accordingly, Defendants discriminated against Plaintiff by virtue of its disparate treatment of Plaintiff in comparison to similarly situated individuals outside of his protected class, in violation of Mass. Gen. L. ch. 151B.

**COUNT III**
**Violation of Mass. Gen. L. ch. 151B**
**<u>Discrimination Based on Race, Color, or National Origin</u>**
**(As to Defendants Boston University and the Trustees of Boston University)**

413. Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

414.     Mass. Gen. L. ch. 151B *et seq.* prohibits an employer from discriminating against an individual on the basis of race, color, or national origin.

415.     Plaintiff has met his initial burden to establish a claim under Mass. Gen. L. ch. 151B for discrimination based on race, color, or national origin because: (i) he is a member of a protected class, as a male of East Indian (South Asian) descent; (ii) he performed his job satisfactorily; and (iii) he suffered an adverse employment action when he was terminated from BU effective April 30, 2023.

416.     As described above, the entire proceeding was marred by procedural irregularities and influenced by BU decision-makers' biases and preconceived and stereotypical notions directed at Plaintiff's race (Asian), color (brown), national origin (India), age (63), and sex (male).

417.     As described in the foregoing paragraphs, Defendants, by their individual and or concerted acts and/or omissions, including but not limited to those described herein, engaged in unlawful employment discrimination on the basis of Plaintiff's race, color, and/or national origin, and thereby deprived him of rights secured under Mass. Gen. L ch. 151B.

418.     As a direct and proximate result of the foregoing, Plaintiff did suffer and continues to suffer substantial damages, including without limitation, emotional and psychological distress, loss of career opportunities, past and future economic injuries, reputational harm, and other direct and consequential damages.

419.     Accordingly, Defendants discriminated against Plaintiff based on his race, color, or national origin, in violation of Mass. Gen. L. ch. 151B.

**COUNT IV**
**Discrimination Based on Age – Violation of Mass. Gen. L. ch. 151B**
**(As to Defendants Boston University and the Trustees of Boston University)**

420.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

421.    Mass. Gen. L. ch. 151B *et seq.* prohibits an employer from discriminating against an individual on the basis of age.

422.    Plaintiff has met his initial burden to establish a claim under Mass. Gen. L. ch. 151B for discrimination based on age because: (i) he is a member of a protected class- at the time of his termination, Dr. Doe was 63 years old; (ii) he performed his job satisfactorily; and (iii) he suffered an adverse employment action when he was terminated from BU effective April 30, 2023.

423.    As described above at ¶¶ 362-368, Defendants discriminated against Plaintiff and terminated his employment based on his age.

424.    As described in the foregoing paragraphs, Defendants, by their individual and or concerted acts and/or omissions, including but not limited to those described herein, engaged in unlawful employment discrimination on the basis of Plaintiff's age, and thereby deprived him of rights secured under Mass. Gen. L. ch. 151B.

425.    As a direct and proximate result of the foregoing, Plaintiff did suffer and continues to suffer substantial damages, including without limitation, emotional and psychological distress, loss of career opportunities, past and future economic injuries, reputational harm, and other direct and consequential damages.

426.    Accordingly, Defendants discriminated against Plaintiff based on his age, in violation of Mass. Gen. L. ch. 151B.

**COUNT V**
**Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. §§ 2000e to 2000e-17 -**
<u>**Discrimination Based on Sex or Gender**</u>
**(As to Defendants Boston University and the Trustees of Boston University)**

427.   Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

428.   Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, prohibits an employer from discriminating against an employee on the basis of their sex.

429.   By the conduct alleged in detail above and herein, Defendants, through their agents and/or employees, subjected Plaintiff to disparate treatment and disparate discipline on the basis of his gender.

430.   To establish a claim for disparate treatment on the basis of gender, a plaintiff must demonstrate that: (i) plaintiff "belonged to a protected class;" (ii) plaintiff performed their job in a satisfactory manner; (iii) plaintiff's employer rendered "an adverse employment decision" against plaintiff; and (iv) plaintiff's employer continued to have their "duties performed by a comparably qualified person." *Bonilla-Ramirez v. MVM, Inc.,* 904 F.3d 88, 94 (1st Cir. 2018).

431.   Plaintiff is a male and is therefore a member of a protected class.

432.   During his 24-year career as a professor at BU, Plaintiff performed the duties required by his position in a satisfactory manner. Dr. Doe is a world-renowned scientist, has received numerous awards for his contributions to his field, and between 1986 and 2022, Dr. Doe authored or co-authored 100 articles published in scholarly, peer-reviewed medical journals, including seventeen articles published between 2019 and 2022, alone. Moreover, Dr. Doe supervised approximately 100 lab personnel, including non-student research assistants employed by BU, mentored numerous medical students, graduate students, and undergraduate students, and was named the 2006 "Mentor of the Year" by BU.

433. Plaintiff suffered an adverse employment action when BU terminated Plaintiff's decades-long rolling appointment as a full-time professor "for cause," effective April 30, 2023.

434. Upon information and belief, BU still employs professors of comparable qualifications to Plaintiff.

435. Further, as described above at ¶¶ 352-361, Defendants' purported justification for Defendants' termination of Dr. Doe's employment was a pretext for unlawful discrimination, as evidenced by Defendants' deviations from BU's policies and procedures.

436. As described in the foregoing paragraphs, Defendants, by their individual and or concerted acts and/or omissions, including but not limited to those described herein, engaged in unlawful employment discrimination on the basis of Plaintiff's sex or gender, in violation of the Civil Right Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000 to 2000e-17.

437. As a direct and proximate result of the foregoing, Plaintiff did suffer and continues to suffer substantial damages, including without limitation, emotional and psychological distress, loss of career opportunities, past and future economic injuries, reputational harm, and other direct and consequential damages.

### COUNT VI
**Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. §§ 2000e to 2000e-17 –**
<u>**Discrimination Based on Race, Color, or National Origin**</u>
**(As to Defendants Boston University and the Trustees of Boston University)**

438. Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

439. Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, prohibits an employer from discriminating against an employee on the basis of race, color, or national origin.

440.    Plaintiff has met his initial burden because: (i) he is a member of a protected class, as a male of East Indian (South Asian) descent; (ii) he performed his job satisfactorily; and (iii) he suffered an adverse employment action when he was terminated from BU effective April 30, 2023.

441.    Additionally, upon information and belief, BU still employs professors of comparable qualifications to Plaintiff.

442.    Further, as described above at ¶¶ 352-361, Defendants' purported justification for Defendants' termination of Dr. Doe's employment was a pretext for unlawful discrimination, as evidenced by Defendants' deviations from BU's policies and procedures.

443.    As described in the foregoing paragraphs, Defendants, by their individual and/or concerted acts and/or omissions, including but not limited to those described herein, engaged in unlawful employment discrimination on the basis of Plaintiff's race and/or color and/or national origin, in violation of Title VII of the Civil Right Act of 1964, 42 U.S.C. §§ 2000 to 2000e-17.

444.    As a direct and proximate result of the foregoing, Plaintiff did suffer and continues to suffer substantial damages, including without limitation, emotional and psychological distress, loss of career opportunities, past and future economic injuries, reputational harm, and other direct and consequential damages.

## COUNT VII
## Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*
### (As to Defendants Boston University and the Trustees of Boston University)

445.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

446.    The ADEA makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his

compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1).

447.    To establish a prima facie case of employment discrimination in the context of an ADEA claim for discriminatory firing, a plaintiff must show: (i) that he was at least 40 years old at the time he was fired; (ii) he was qualified for the position he held; (iii) he was fired; and (iv) the employer subsequently filled the position, demonstrating a continuing need for the plaintiff's services. *See Velez v. Thermo King de Puerto Rico, Inc.,* 585 F.3d 441, 447 (1st Cir. 2009)

448.    Plaintiff is a member of a protected class because he was at least 40 years old at the time he was terminated from BU.

449.    Plaintiff was qualified for the position he held while employed by BU and performed the duties required by his position in a satisfactory manner.

450.    Plaintiff was terminated from his position as a full-time professor "for cause," effective April 30, 2023.

451.    Upon information and belief, BU employs professors of comparable qualifications to Plaintiff demonstrating the continued need for such services.

452.    Further, as described above at ¶¶ 352-361, Defendants' purported justification for Defendants' termination of Dr. Doe's employment was a pretext for unlawful discrimination, as evidenced by Defendants' deviations from BU's policies and procedures.

453.    As described in the foregoing paragraphs, Defendants, by their individual and/or concerted acts and/or omissions, including but not limited to those described herein, engaged in unlawful employment discrimination on the basis of Plaintiff's age, and thereby deprived him of rights secured under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C § 621 *et seq.*

454. As a direct and proximate result of the foregoing, Plaintiff did suffer and continues to suffer substantial damages, including without limitation, emotional and psychological distress, loss of career opportunities, past and future economic injuries, reputational harm, and other direct and consequential damages.

**COUNT VIII**
**<u>Breach of Contract</u>**
**(As to Defendants Boston University and the Trustees of Boston University)**

455. Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

456. Plaintiff's appointment with Defendants was an employment contract that incorporated the BU Faculty Handbook and all of its applicable employment policies, including the Appointment Policy, the For Cause Policy, the Post August 2020 Policy, and the Procedures.

457. Based on the aforementioned facts and circumstances, Defendants breached express and implied agreements with Plaintiff.

458. The following is a non-exhaustive list of the ways in which Defendants violated Plaintiff's contractual right to due process by failing to adhere to its own binding procedures with respect to the anonymous complaint and Roe's complaint against Plaintiff:

    a. BU failed to provide Dr. Doe the requisite notice of Roe's complaint when it placed him on administrative leave.

    b. BU placed Dr. Doe on an unwarranted administrative leave, although the allegations in Roe's complaint posed no "immediate threat to the physical health or safety of any student or person" arising from "allegations of Title IX Sexual Misconduct" under the Procedures, and it was not necessary to restore equal access for the Complainant to BU's education and work environments or to protect the safety of the campus community.

    c. Instead of dismissing the anonymous complaint, non-Title IX report against Dr. Doe within 90 days, BU violated the Procedures when it consolidated the anonymous complaint against Dr. Doe with Roe's complaint.

78.

   d.  BU failed to afford Dr. Doe his rights to an impartial and fair complaint resolution process when it designated Mr. Sokolow, a paid consultant, to preside over both the Hearing Board as Hearing Chairperson and to handle the investigation into the allegations against Dr. Doe over the objections of Dr. Doe's advisor.

   e.  BU violated Section VII.C. of the Procedures, ("Mandatory Dismissal"), when it failed to dismiss Roe's complaint from the Title IX proceeding, despite that *"[t]he alleged misconduct, even if proved, would not constitute Title IX Sexual Misconduct as defined in the Sexual Misconduct Policy."*

   f.  BU failed to permit Dr. Doe to review and inspect the evidence, as required under Section III of the Procedures ("Rights of the Complainant and Respondent During the Complaint Resolution Process"), which explicitly grants the parties the right "[t]o inspect, review, and respond to evidence *during the investigation and prior to* the completion of the investigative report."

   g.  BU failed to apply the appropriate burden of proof, pursuant to Section XII.A. of the Procedures. BU wrongly credited Roe's word against Dr. Doe, relied on impermissible character evidence, and wrongfully imposed on Dr. Doe the burden of *disproving* the allegations against him, all in violation of the Procedures.

   h.  In violation of the Procedures that required Dean Antman to constrain her review to the Hearing Report, she conducted her own investigation, including ex parte interviews with Sokolow and Dr. Coleman, and relied on facts gleaned in this secret investigation to arrive at her recommend sanction of termination of Dr. Doe's employment.

   i.  BU failed to recommend an appropriate sanction proportionate to the alleged offense following an investigation under applicable procedures, in violation of the For Cause Policy of the Handbook and BU's past practice, and instead terminated Dr. Doe's employment based on an alleged minor violation of an obsolete policy.

459.   The foregoing violations, individually and in the aggregate, resulted in a process that was neither fair nor impartial, ultimately resulting in an erroneous finding against Plaintiff.

460.   As a direct and proximate result of Defendants' material breach of the terms and conditions of the employment agreement, Dr. Doe has sustained tremendous damages, including

without limitation, emotional and psychological distress, loss of career opportunities, past and future economic injuries, reputational harm, and other direct and consequential damages.

## COUNT IX
## Denial of Basic Fairness
**(As to Defendants Boston University and the Trustees of Boston University)**

461.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

462.    Massachusetts courts have held as part of the implied covenant of good faith and fair dealing that school disciplinary hearings must be "conducted with basic fairness." *Cloud v. Trs. of Bos. Univ.*, 720 F.2d 721, 725 (1st Cir. 1983) (citing *Coveney v. President & Trs. of Holy Cross Coll.*, 445 N.E.2d 136, 139 (Mass. 1983)); *Schaer v. Brandeis Univ.*, 735 N.E.2d 373, 380 (Mass. 2000).

463.    In the context of a private university's disciplinary process, there are two principal threads to the "fairness" inquiry. The first is *procedural fairness*—that is, whether the process used to adjudicate the matter was sufficient to provide the accused [individual] a fair and reasonable opportunity to defend himself. The second is *substantive fairness*—that is, even if the procedure was fair, whether the decision was unduly arbitrary or irrational, or tainted by bias or other unfairness. *Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 602 (D. Mass. 2016).

464.    Consistent with the implied covenant of good faith and fair dealing, BU's applicable policies and procedures explicitly promise that "the complaint resolution process, including the investigation and any hearing and disciplinary proceedings, will be impartial and conducted by an individual who does not have a conflict of interest or bias."

465.    BU's policies assure that BU will treat a respondent and a complainant fairly at every step of the complaint resolution process.

466.     Defendants breached the duty to provide basic fairness because the procedures employed by BU at each step of its complaint resolution process were so stacked in favor of Roe and against Dr. Doe that it denied him any fair chance to defend himself.

467.     The following is a non-exhaustive list of the ways in which Defendants breached the duty to provide basic fairness:

    a.   BU reached determinations, including findings of fact and credibility determinations, that were incorrect, contrary to the weight of the evidence, irrational, and tainted by bias.

    b.   Without providing Dr. Doe notice of the charges against him, BU ordered Dr. Doe banned from campus.

    c.   BU relied on the existence of a purported anonymous complaint to charge Dr. Doe with a "pattern" of behavior.

    d.   BU's decision maker, Dean Antman, recommended a sanction based on *ex parte* communications with Chairperson Sokolow and Professor Coleman, to which Dr. Doe was not a part, and purported standards of conduct that were never published and of which Dr. Doe had no notice.

    e.   BU's investigators denied Dr. Doe's right to equal access to information during the investigation.

    f.   BU repeatedly failed to afford Dr. Doe the presumption of innocence, and presumed Dr. Doe was guilty from the outset. BU's presumption of Dr. Doe's guilt was revealed when:

        i.   BU placed Dr. Doe on administrative leave and banned him from teaching, conducting research, and access to the campus before conducting any investigation at all, in breach of his reasonable expectation that he would be assumed not responsible until proven otherwise.

        ii.   BU's Hearing Board Chairman, Sokolow, presumed the existence of a Complainant #1 and repeatedly referred to Roe as "Complainant #2" in the Title IX Hearing Report based on an *unsubstantiated anonymous complaint* that was dismissed by BU.

        iii.   Dean Antman testified that she had *"guessed"* that there were other complaints of sexual misconduct against Dr. Doe, despite

81.

that the evidentiary record demonstrated that there had been no other such complaints against Dr. Doe in his entire employment history.

468.    As a direct and proximate result of the above conduct, Dr. Doe has sustained tremendous damages, including without limitation, emotional and psychological distress, loss of career opportunities, past and future economic injuries, reputational harm, and other direct and consequential damages.

**COUNT X**
**Estoppel**
**(As to Defendants Boston University and the Trustees of Boston University)**

469.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

470.    Dr. Doe's relationship with BU was governed by his employment contract with BU, as well as Dr. Doe's reasonable expectations based on BU's various policies and procedures.

471.    Under Massachusetts law, a party is liable for estoppel when: (1) a promisor makes a promise which it should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee; (2) the promise did induce action or forbearance; and (3) "injustice can be avoided only by enforcement of the promise." *See Neuhoff v. Marvin Lumber & Cedar Co.*, 370 F.3d 197, 203 (1st Cir. 2004)) (applying Massachusetts law).

472.    BU's various policies and procedures constitute unambiguous representations and promises that BU should have reasonably expected to induce action or forbearance by Dr. Doe and which did induce Dr. Doe's actions or forbearance.

473.    BU expected or should have expected Dr. Doe to accept its offer of employment and to choose not to pursue employment at other colleges or universities based on its express and implied promises that BU would not tolerate, and Dr. Doe would not suffer, discrimination, and

would not deny Dr. Doe basic fairness in its disciplinary proceedings should he be accused of a violation of BU's policies. Dr. Doe relied to his detriment on these express and implied promises and representations made by BU and was induced by BU's promises in making his decision to further his career at BU instead of at another medical school of equal caliber.

474.    Based on the foregoing, BU is liable to Dr. Doe based on Estoppel.

475.    As a direct and proximate result of the above conduct, Dr. Doe has sustained tremendous damages, including without limitation, emotional and psychological distress, loss of career opportunities, past and future economic injuries, reputational harm, and other direct and consequential damages.

### COUNT XI
### Breach of the Implied Covenant of Good Faith and Fair Dealing
### (As to Defendants Boston University and the Trustees of Boston University)

476.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

477.    "Under Massachusetts law, a covenant of good faith and fair dealing is implied in every contract. *Doe v. Brandeis Univ.,* 177 F. Supp. 3d 561, 612 (D. Mass. 2016) (citing *UNO Rests., Inc. v. Boston Kenmore Realty Corp.*, 441 Mass. 376, 385 (2004)). "The covenant provides that "neither party shall do anything that will have the effect of destroying or injuring the rights of the other party to receive the fruits of the contract." *Id.* (quoting *Anthony's Pier Four, Inc. v. HBC Assocs.*, 411 Mass. 451, 471 (1991)).

478.    BU breached the duty of good faith and fair dealing by ignoring the terms of Dr. Doe's employment and the policies set forth in the Handbook, and carrying out these employment policies and procedures in ways that the parties never intended and which Dr. Doe could not have

reasonably anticipated. The following is a non-exhaustive list of the ways in which BU breached its duty of good faith and fair dealing.

479.   BU failed to dismiss an anonymous complaint against Dr. Doe as required under the applicable procedures, and instead consolidated it with Roe's signed complaint.

480.   In further breach of its obligations of good faith and fair dealing, BU decision-makers drew unwarranted inferences based on the anonymous complaint that there existed a "Complainant #1" and a "pattern" of behavior, which BU's decision-makers erroneously relied on to sanction Dr. Doe with the termination of his employment.

481.   BU breached the duty of good faith and fair dealing by presenting Dr. Doe with an overly complex set of procedures and policies that were so opaque he could not be certain throughout the proceeding as to which policy or procedure applied.

482.   Dr. Doe could not have anticipated that BU would apply two different policies and two sets of procedures to his misconduct process, or that BU would pick and choose which employment policies and grievance procedures to apply for the purpose of ensuring it could hold Dr. Doe responsible under an obsolete policy definition, or to later deny his appeal.

483.   More specifically, Dr. Doe could not have anticipated that BU would decline to consider Dr. Doe's challenge to the proportionality of the sanction BU had imposed against him on the basis that it was outside BU's current Procedures after recommending Dr. Doe's employment be terminated based on an alleged violation of BU's corresponding obsolete policy that BU had specifically chosen to retroactively apply in Dr. Doe's case.

484.   Dr. Doe could also not have anticipated that BU would recommend that his employment be sanctioned for alleged conduct that did not violate any current BU policy and that, if true (which it was not) would constitute only a minor violation of an obsolete policy.

485.    In further breach of the duty of good faith and fair dealing, when Dr. Doe submitted his appeal of Dean Antman's sanction and the Hearing Board's determination of responsibility to the Faculty Review Committee pursuant to his rights under the Handbook, BU made Dr. Doe's right to an appeal virtually meaningless when it informed Dr. Doe that BU intended to recommend "non-continuance" of his faculty appointment *regardless of the outcome of his appeal.*

486.    Under Section E of the Appointment Policy of the Handbook, Dr. Doe could reasonably expect that his faculty appointment was eligible for continuance until the conclusion of the disciplinary proceeding.

487.    As a direct and proximate result of Defendants' breach of the covenant of good faith and fair dealing, Dr. Doe has sustained tremendous damages, including without limitation, emotional and psychological distress, loss of career opportunities, past and future economic injuries, reputational harm, and other direct and consequential damages.

## PRAYER FOR RELIEF

**WHEREFORE,** for the foregoing reasons, Plaintiff Dr. Doe demands judgment against Defendants as follows:

(i)    on the first cause of action for violation of Title IX of the Education Amendments of 1972, Erroneous Outcome, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of career and performance opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, and an injunction requiring BU to reinstate Dr. Doe's employment and requiring BU to destroy all disciplinary records concerning Plaintiff;

(ii)    on the second cause of action for discrimination on the basis of sex and gender in violation of M.G.L. c. 151B, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, an award of back pay, front pay, and other compensation and/or benefits, and to make Plaintiff whole for all earnings and benefits Plaintiff would have received but for Defendants' unlawful conduct, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of career and performance opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, and an injunction or other equitable relief requiring BU to reinstate Dr. Doe's employment and requiring BU to destroy all disciplinary records concerning Plaintiff;

(iii)    on the third cause of action for discrimination on the basis of race, color, or national origin in violation of M.G.L. c. 151B, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, an award of back pay, front pay, and other compensation and/or benefits, and to make Plaintiff whole for all earnings and benefits Plaintiff would have received but for Defendants' unlawful conduct, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of career and performance opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, and an injunction or other equitable relief requiring BU to reinstate Dr. Doe's employment and requiring BU to destroy all disciplinary records concerning Plaintiff;

(iv)    on the fourth cause of action for discrimination on the basis of age in violation of M.G.L. c. 151B, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, an award of back pay, front pay, and other compensation and/or

benefits, and to make Plaintiff whole for all earnings and benefits Plaintiff would have received but for Defendants' unlawful conduct, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of career and performance opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, and an injunction or other equitable relief requiring BU to reinstate Dr. Doe's employment and requiring BU to destroy all disciplinary records concerning Plaintiff;

(v)     on the fifth cause of action for discrimination on the basis of sex or gender in violation of Title VII, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, an award of back pay, front pay, and other compensation and/or benefits, and to make Plaintiff whole for all earnings and benefits Plaintiff would have received but for Defendants' unlawful conduct, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of career and performance opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, and an injunction or other equitable relief requiring BU to reinstate Dr. Doe's employment and requiring BU to destroy all disciplinary records concerning Plaintiff;

(vi)    on the sixth cause of action for discrimination on the basis of race, color, or national origin in violation of Title VII, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, an award of back pay, front pay, and other compensation and/or benefits, and to make Plaintiff whole for all earnings and benefits Plaintiff would have received but for Defendants' unlawful conduct, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses,

loss of career and performance opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, and an injunction or other equitable relief requiring BU to reinstate Dr. Doe's employment and requiring BU to destroy all disciplinary records concerning Plaintiff;

(vii)   on the seventh cause of action for discrimination on the basis of age in violation of the ADEA, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, an award of back pay, front pay, and other compensation and/or benefits, and to make Plaintiff whole for all earnings and benefits Plaintiff would have received but for Defendants' unlawful conduct, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of career and performance opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, and an injunction or other equitable relief requiring BU to reinstate Dr. Doe's employment and requiring BU to destroy all disciplinary records concerning Plaintiff;

(viii)   on the eighth cause of action for breach of contract, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of career and performance opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(ix)   on the ninth cause of action for denial of basic fairness under contract and common law, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of career and

88.

performance opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(x)      on the tenth cause of action for estoppel, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to past and future economic losses, loss of educational and career opportunities, loss of future earning capacity, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(xi)      on the eleventh cause of action for breach of the covenant of good faith and fair dealing, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of career and performance opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements; and

(xii)     a declaratory judgment, pursuant to 28 U.S.C. § 2201, declaring  that: (a) the outcome and findings made by BU be reversed; (b) Plaintiff's reputation be restored; (c) Plaintiff's disciplinary record be expunged; (d) the record of Plaintiff's termination be removed from his file; (e) any record of the anonymous complaint or Roe's complaint against Plaintiff be permanently destroyed; (f) Plaintiff be reinstated to employment in his position at BU; and (vii) Plaintiff be awarded such other and further relief as the Court deems just, equitable, and proper.

## JURY DEMAND

Plaintiff herein demands a trial by jury of all triable issues in the present matter.

Dated: Boston, Massachusetts
       March 12, 2024

                              Respectfully submitted,

                              **NESENOFF & MILTENBERG, LLP**
                              *Attorneys for Plaintiff John Doe*

By: /s/ *Andrew T. Miltenberg*
**Andrew T. Miltenberg, Esq.**
**(*pro hac vice* forthcoming)**
**363 Seventh Avenue, Fifth Floor**
**New York, New York 10001**
**(212) 736-4500**
**amiltenberg@nmllplaw.com**

By: /s/ *Tara J. Davis*
**Tara Davis, Esq. (BBO No. 675346)**
**Regina M. Federico, Esq. (BBO No. 700099)**
**Julie A. Sacks, Esq. (BBO No. 674384)**
**101 Federal Street, Nineteenth Floor**
**Boston, Massachusetts 02110**
**(617) 209-2188**
**tdavis@nmllplaw.com**
**rfederico@nmllplaw.com**
**jsacks@nmllplaw.com**