UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN DOE, )<br>)<br>      Plaintiff, )<br>)<br>v. )<br>)<br>TRUSTEES OF BOSTON UNIVERSITY, )<br>)<br>      Defendants. )<br>) | Civil Action No.<br>24-10619-FDS |

**MEMORANDUM AND ORDER ON PLAINTIFF'S
MOTION TO PROCEED UNDER A PSEUDONYM**

**SAYLOR, C.J.**

This case concerns alleged employment discrimination arising out of purportedly false accusations of sexual harassment. Plaintiff John Doe alleges that his former employer, Boston University ("BU"), treated him unfairly in the investigatory and disciplinary processes that were initiated in response to allegations of sexual misconduct made against him. He asserts claims of discrimination under federal and state law.

Plaintiff has moved to proceed under a pseudonym. For the reasons set forth below, that motion will be granted.

**I.      Factual Background**

Prior to his termination, "John Doe" was employed as a professor at Boston University for 24 years. (Compl. ¶ 2). According to the complaint, Doe is a 63-year-old, "medium-complexioned male of East-Indian (South Asian) descent." (*Id.* ¶ 33).

In July 2019, Doe met "Jane Roe"[1] when she was working as a server and she waited on Doe and his family. (*Id.* ¶ 127). As a recent college graduate, she expressed interest in obtaining research experience. She later interviewed for a volunteer position in Doe's lab. (*Id.* ¶¶ 129, 131). She began working for Doe as a volunteer on August 19, 2019, eventually transitioning to paid employment as a part-time research assistant. She resigned from that position on April 2, 2021. (*Id.* ¶¶ 131-32).

According to the complaint, Roe left her position because she felt she was not making enough money, preferred clinical work to research, and had found a new position as an ophthalmic technician. (*Id.* ¶ 134). Upon leaving, Roe sent an email to an administrator and a letter to Doe expressing gratitude for her time in the lab. (*Id.* ¶¶ 135-36).

On October 7, 2021, BU received an anonymous report alleging that Doe had inappropriately touched and sexually harassed multiple women in his lab, including the anonymous reporter. (*Id.* ¶¶ 137-38). On October 15, 2021, the university's Title IX coordinator, Jessica Nagle, sent Doe a "notice of investigation and allegations" ("NOIA") informing Doe of the anonymous allegations and notifying him that BU's Equal Opportunity Office ("EOO") would be conducting an investigation "pursuant to BU's Sexual Misconduct Policy . . . that applies to conduct that occurred on or after August 14, 2020," and "The Procedures for the Resolution of Non-Title IX Sexual Misconduct Complaints Against Faculty." (*Id.* ¶¶ 137-39). Under the latter set of procedures, the university would "seek to resolve every report of sexual misconduct within 90 calendar days after the filing of the complaint." (*Id.* ¶ 140).

On January 23, 2022, the university notified Doe that they would not be able to complete

---

[1] Both John Doe and Jane Roe are pseudonyms.

the grievance process within 90 days, but were attempting to conclude their interviews within the week and complete the process before February 20, 2022. (*Id.* ¶ 142). On the same day, January 23, 2022, Jane Roe signed a formal complaint with BU's Title IX office. (*Id.* ¶ 143).[2]

Four days later, on January 27, 2022, Doe was put on administrative leave and removed from campus. (*Id.* ¶¶ 145-46, 148). According to the complaint, he was not informed of the basis for his removal. (*Id.* ¶¶ 145, 147). The complaint further alleges that BU did not conduct an "individualized safety and risk analysis" prior to removing him from campus as required under Title IX. (*Id.* ¶¶ 149-53).

On February 2, 2022, Nagle sent Doe another NOIA, this time notifying him of Roe's formal complaint. (*Id.* ¶ 155). The formal complaint alleged that Doe had "engaged in sexual harassment toward [Roe] while she worked in [his] lab from August 19, 2020 to April 2021," including inappropriate touching and kissing; remarks on her physical appearance; purchasing clothes for her and asking her to try them on; repeatedly telephoning her at night; and retaliating against her by removing her name as a co-author on two publications after she left. (*Id.* ¶ 157). At the same time, Nagle informed him that BU would be updating its October 15 notice and would now be referring to the anonymous reporter as "Complainant 1" and to Roe as "Complainant 2." (*Id.* ¶ 158). The complaint alleges that both Roe's filing of a formal complaint and the consolidation of the two complaints were improper under Title IX and BU's internal procedures. (*Id.* ¶¶ 159-72).

According to the complaint, the February 2 NOIA informed Doe that due to the time

---

[2] Defendant's answer contends "that Roe submitted a formal complaint to the University's Title IX Coordinator on January 24, 2022." (Ans. ¶ 143). This does not necessarily contradict plaintiff's assertion that Roe *signed* her complaint on January 23. Furthermore, defendant later admits, without qualification, to paragraph 156 of the complaint, which states: "The February NOIA advised Dr. Doe that on *January 23*, 2022, BU received a 'signed Formal Complaint' from Roe." (emphasis added).

period covered by the allegations, he was alleged to have violated two policies—specifically, a policy covering allegations occurring before August 14, 2020, and a policy covering allegations occurring on or after that date. (*Id.* ¶¶ 174-75). Those policies contain different definitions of "sexual harassment," with the complaint alleging that the post-August 2020 definition comports with Title IX, while the pre-August 2020 definition does not. (*Id.* ¶¶ 175-78). Similarly, the complaint alleges that the February 2 NOIA indicated the allegations would be assessed under two different sets of procedures, covering pre- and post-August 14, 2020 allegations, with the pre-2020 procedures being deficient in procedural protections and fundamental fairness. (*Id.* ¶¶ 181-84). The complaint further alleges that, during the investigation, BU assisted Roe in fixing factual discrepancies in her complaint, reflected in an updated NOIA sent on February 15, 2022. (*Id.* ¶¶ 185-90).

The complaint alleges that the investigation was unfair and biased, and that BU restricted Doe's ability to access and review the evidence against him. (*Id.* ¶¶ 191-201). On May 20, 2022, BU conducted a hearing on the allegations. (*Id.* ¶ 202). According to the complaint, that hearing was overseen by a biased chairperson, and suffered from procedural shortcomings, including improper treatment of evidence. (*Id.* ¶¶ 202-14).

On May 26, 2022, the chairperson released a written "Title IX Hearing Report" detailing the Hearing Board's findings. (*Id.* ¶ 215). The Hearing Board found Doe responsible for sexual harassment under the policy applicable to conduct that occurred before August 14, 2020, and found him not responsible for sexual harassment under the policy applicable to conduct that occurred on or after that date. (*Id.* ¶¶ 219-21). The complaint alleges that the Board made biased and discriminatory credibility determinations and disregarded exculpatory evidence, coming to conclusions that were contrary to the weight of the evidence. (*Id.* at ¶¶ 222-46). On

May 31, 2022, after the hearing had been completed and the written decision released, BU notified Doe that it was dismissing the anonymous complaint against him because (according to the complaint) BU had been unable to identify the complainant. (*Id.* ¶ 247).

On June 1, 2022, Dr. Karen Antman, dean of the BU medical school, issued a "sanction report" recommending termination of Doe's employment. (*Id.* ¶ 249). The complaint alleges that Antman's report was at least in part influenced by conversations she had with the chairperson of Doe's Title IX hearing and the former chair of the department of medicine. (*Id.* ¶¶ 249-51).

On June 13, 2022, Doe submitted an appeal under the pre-August 14, 2020 procedures. (*Id.* ¶ 257). According to the complaint, on June 27, 2022, Dr. Daniel Kleinmann, the associate provost for graduate affairs, notified Doe that his appeal had been denied in its entirety, that Kleinmann had followed the *post*-August 14, 2020 procedures, and that Kleinman had declined to consider arguments that were based on grounds contained in the pre-August 14, 2020 procedures (despite the fact that it was only under the pre-August 14, 2020 policy, for alleged pre-August 14, 2020 conduct, that the Hearing Board had found Doe responsible for sexual harassment). (*Id.* ¶¶ 269-71; Ans. ¶¶ 270-71).

On July 19, 2022, Doe was notified that BU would commence "for-cause" termination proceedings against him based on the Title IX Hearing Report. (Compl. ¶ 273). Separately, on the same day, BU issued Doe a "notice of non-continuance" indicating that were he to succeed in an appeal of his for-cause termination, BU would nevertheless discontinue his rolling faculty appointment. (*Id.* ¶¶ 279-82).

On January 12, 2023, Doe appeared before the "Faculty Hearing Committee" for the formal for-cause termination proceedings. (*Id.* ¶¶ 285-88). Dean Antman testified for the Office

of the Provost.  (*Id.* ¶ 290).  In her testimony, she indicated that in making her recommendation of termination, she had relied on the Title IX Hearing Report, had spoken to the chairperson of that hearing and the chair of the department of medicine, and had not spoken to Doe.  (*Id.* ¶ 290-91, 311).  The complaint alleges that much of her testimony evinced a biased and discriminatory animus motivating her sanction recommendation.  (*Id.* ¶¶ 309, 323).  Dr. Coleman, the former chair of the department of medicine, also appeared at the hearing and testified that he had relied on the chairperson of the Title IX hearing to get more information on the substance of the Hearing Report and the rationale behind the Hearing Board's findings.  (*Id.* ¶¶ 324, 327-28).

On February 1, 2023, the Faculty Hearing Committee reached a split decision, with a majority of three recommending suspension for the duration of Doe's appointment and two recommending termination.  (*Id.* ¶ 341).  On February 21, 2023, BU's President rejected the majority and instead recommended termination.  (*Id.* ¶ 348).  On March 14, 2023, the BU Board of Trustees voted to terminate Doe's faculty appointment for cause, and on March 16, 2023, Doe was notified that his employment at BU would end on April 30, 2023.  (*Id.* ¶ 350).

Doe's appointment was then terminated on April 30.

## II. **Legal Standard**

There is a "strong presumption against the use of pseudonyms in civil litigation." *Does 1-3 v. Mills*, 39 F.4th 20, 25 (1st Cir. 2022).  Their use is generally only warranted in "exceptional cases." *Doe v. Massachusetts Inst. of Tech.*, 46 F.4th 61, 71 (1st Cir. 2022).  And it is "[t]he party seeking pseudonymity [that] bears the burden of rebutting the strong presumption against it." *Id.* at 73.

The First Circuit has identified four paradigmatic situations in which proceeding under a pseudonym is appropriate, including when (1) there is a risk of "unusually severe harm"; (2) identifying the plaintiffs would harm "non-parties"; (3) it is "necessary to forestall a chilling

6

effect on future litigants who may be similarly situated"; or (4) the lawsuit is "bound up with a prior proceeding made confidential by law." *Id.* at 71.  However, "these paradigms are rough cuts," and a strong or weak showing under any one of them, or any combination of them, is not necessarily dispositive.  *Id.* at 72.  While "[i]n most cases, the inquiry should focus upon the extent to which the facts align with one or more of [these] paradigms," they do not "capture the entire universe of cases in which pseudonymity may be appropriate." *Id.*  Thus, the court must balance "the interests asserted by the movant in favor of privacy against the public interest in transparency" in light of the totality of the circumstances.  *Id.*

### III.     Analysis

For the reasons set forth below, Doe's argument for using a pseudonym has at least a foothold in all four *MIT* paradigms.  In light of the totality of the circumstances, and the balancing of the relevant interests, the Court finds that maintaining his anonymity is appropriate at this stage of the litigation.

This case most clearly fits within the fourth paradigm—it is a lawsuit "bound up with a prior proceeding made confidential by law." *Id.* at 71.  At the core of the complaint is a Title IX proceeding that Doe contends was conducted improperly—both the proceeding itself and the decisions made based upon its findings are the subjects of the complaint.  As the First Circuit has noted, "[t]he public has an abiding interest in ensuring that the values underpinning the confidentiality protections imposed by . . . Title IX are not subverted by collateral attacks in federal court." *Id.* at 76.  Furthermore, the regulations implementing Title IX require that "the complainant and respondent [are treated] equitably." 34 C.F.R. § 106.44(f)(1)(i).  It would make little sense to require that, in a suit alleging the Title IX process was conducted unfairly and in a discriminatory manner, yet another fundamental tenet of the process should be betrayed by piercing its confidentiality.  Although defendant contends that this is simply a "garden-variety"

7

employment dispute, in fact the claims arise from the unique context of sexual-harassment allegations investigated and adjudicated under confidential Title IX procedures.

While this case does not fit quite as neatly within the outlines of the remaining paradigms, on the whole they lend additional support to maintaining Doe's anonymity. *See M.I.T.*, 46 F.4th at 72 ("[I]t is possible that a party whose case for pseudonymity appears weak when each paradigm is analyzed separately may nonetheless make a persuasive showing when multiple paradigms are implicated.").

The first paradigm is one in which "a would-be Doe . . . reasonably fears that coming out of the shadows will cause him unusually severe harm." *M.I.T.*, 46 F.4th at 71. While the bare possibility of reputational harm will not generally suffice to justify concealing a litigant's name, there is a special opprobrium attached to allegations of sexual misconduct. That is often true even without regard to ultimate exculpation, and particularly true in the case of a faculty member at an educational institution. Furthermore, there is a unique feature of the harm Doe faces that dovetails with the third paradigm and augments its significance in this context.

The third paradigm is one "in which anonymity is necessary to forestall a chilling effect on future litigants who may be similarly situated." *Id.* at 71. The First Circuit specifically cites, as typical examples, cases "in which 'the injury litigated against would be incurred as a result of the disclosure of the [party's] identity.'" *Id.* (quoting *Doe v. Frank*, 951 F.2d 320, 324 (11th Cir. 1992)). That is exactly what Doe faces here. Fundamentally, he is challenging a finding of culpability and a record of allegations, in large part for fear of the impact they might have if publicized or communicated to potential future employers. Were he to be identified in this litigation, his name would be publicly and permanently associated with that finding of culpability and those allegations, thus incurring the very "injury litigated against." *Id.* The public certainly

8

has an interest in fair and unbiased Title IX proceedings. Those parties who wish to litigate the fairness of those proceedings are less likely to do so if it would require waiving their confidentiality and publicly associating themselves with the allegations and findings they challenge as erroneous.

In support of the argument that full disclosure of one's identity has no deterrent effect on similarly situated prospective plaintiffs, defendant cites a handful of cases in which plaintiffs filed suit under their real names. However, nearly all of those cases are distinguishable. *See, e.g.*, *Ronda-Perez v. Banco Bilbao Vizcaya Argentaria—Puerto Rico*, 404 F.3d 42 (1st Cir. 2005) (no underlying Title IX proceeding); *Bennett v. Saint-Gobain Corp.*, 507 F.3d 23 (1st Cir. 2007) (same); *Pepin v. Gen. Dynamics-OTS, Inc.*, 2016 WL 6902117 (D. Me. Nov. 23, 2016) (same); *Farzinpour v. Berklee Coll. of Music*, 616 F. Supp. 3d 98 (D. Mass. 2022) (allegations against plaintiff publicized prior to suit); *Verdu v. Trustees of Princeton Univ.*, 2020 WL 1502849 (D.N.J. Mar. 30, 2020) (same); *Crowther v. Bd. of Regents of Univ. Sys. of Georgia*, 661 F. Supp. 3d 1342 (N.D. Ga. 2023) (plaintiff identified in police tip, accusations made broadly). Where, as here, a plaintiff has managed to keep allegedly false accusations of sexual misconduct out of the broader public realm, the requirement to disclose his identity in order to litigate would certainly discourage resort to the courts.

The final paradigm is the case "in which identifying the would-be Doe would harm 'innocent non-parties.'" *M.I.T.*, 46 F.4th at 71 (quoting *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 190 (2d Cir. 2008)). In this case, the relevant harm would be the collateral identification of Jane Roe, the research assistant who made the underlying allegations against Doe. While identifying Doe would not necessarily reveal Roe's identity—or even make her identification all that straightforward—it is difficult to deny that identifying him would make it

9

easier to identify her. Doe may have supervised nearly 100 individuals in his laboratory over the years, but presumably not very many of Roe's approximate age and gender during the one-and-a-half-year window set out in the complaint. While not necessarily dispositive on its own, the risk to Roe only bolsters the case for keeping Doe's identity concealed.

The four *M.I.T.* paradigms are important guides, but there are additional factors to consider that also ultimately favor permitting the use of a pseudonym. As the First Circuit stated, the test for proceeding under a pseudonym "must center on the totality of the circumstances," *id.* at 70, and the adjudicating court "should balance the interests asserted by the movant in favor of privacy against the public interest in transparency," *id.* at 72.

To begin, the public's interest in the identity of plaintiff does not appear to be significant. Plaintiff is challenging the fairness of an institutional process, and the institution has been identified. Much of plaintiff's claim centers on disputed interpretation and application of regulatory law and internal university protocols. The actual identity of plaintiff is not central to the public's interest in the case. *See Doe v. Purdue Univ.*, 321 F.R.D. 339, 343 (N.D. Ind. 2017) ("[T]he public interest will continue to be served as the record in this case will not be sealed and the legal and procedural rulings in this case will remain a matter of public record . . . . The actual identities of [p]laintiff and his accuser are of minimal value to the public."). In opposition, defendant invokes the "serious risk that pseudonymous lawsuits erode public access to and public trust in judicial proceedings." (Opp. at 13). But that risk, or at least the risk posed by this case, is surely exaggerated. This matter involves a specific type of claim—a challenge to Title IX proceedings that allegedly reached an unfair and biased conclusion. This is not a garden-variety case involving claims of unlawful discrimination or other wrongful conduct. Allowing plaintiff to proceed under a pseudonym under the narrow circumstances presented by

this case poses no great risk to the judicial system.

Furthermore, proceeding under a pseudonym would not substantially prejudice the defense. The essence of this litigation is not a reopening of the investigation into Doe's alleged conduct, but instead a dispute concerning an already-completed inquiry. It is not clear why the inability to reveal Doe's identity would be a significant impediment to appropriately focused discovery. *See, e.g.*, *Doe v. Colgate Univ.*, 2016 WL 1448829, at *3 (N.D.N.Y. Apr. 12, 2016) ("Defendants will not be prejudiced by allowing [p]laintiff to proceed anonymously . . . . Defendants are aware of [p]laintiff's true identity and will have an uninhibited opportunity to litigate this matter regardless of whether [p]laintiff's identity is disclosed publicly."); *Doe No. 2 v. Kolko*, 242 F.R.D. 193, 198 (E.D.N.Y. 2006) ("Other than the need to make redactions and take measures not to disclose plaintiff's identity, defendants will not be hampered or inconvenienced merely my plaintiff's anonymity in court papers.").

Finally, and contrary to defendant's contention, there is a substantial difference between disclosing unique aspects of one's identity in court filings and disclosing one's actual name. Of course, "pseudonymity will never be justified when the public disclosure that the party seeks to forestall is already a fact." *M.I.T.*, 46 F.4th at 72 n.3. However, that is not the case here. To begin, as a technical matter, deducing Doe's identity from the information disclosed in the complaint is not as definite as an identification by name. More importantly, to identify Doe by name in this case has more significant practical consequences than simply leaving distinctive personal information in the record. If Doe's actual name were to be used in this case, a simple Internet search or background check would connect him with this dispute and these allegations immediately. But to connect him to these allegations without his name being used, one would need to already suspect that he was involved, seek out the record of this lawsuit, and then look to

11

the personal details disclosed and connect the dots.

Ultimately, the Court enjoys "broad discretion to quantify the need for anonymity in the case before it," extending to the "ultimate determination as to whether that need outweighs the public's transparency interest." *M.I.T.*, 46 F.4th at 72.  This case is based on an underlying confidential proceeding; the harm to Doe should his identity be revealed may be substantial; future litigants might be chilled from asserting their rights; and if Doe were identified, it would become significantly easier to identify Jane Roe, a non-party to this dispute.  Those factors favor the use of a pseudonym, and are not counterbalanced by any substantial public interest that would be served, or prejudice to the defense that would be avoided, by revealing Doe's identity.  For those reasons, the Court will grant plaintiff's motion to proceed under a pseudonym.

It is important to note, however, that "the balance between a party's need for anonymity and the interests weighing in favor of open judicial proceedings may change as the litigation progresses," *Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1069 (9th Cir. 2000), and "[c]onsequently, an order granting pseudonymity should be periodically reevaluated if and when circumstances change," *Doe v. M.I.T.*, 46 F.4th at 73.

Even if the court grants permission to proceed under a pseudonym, as it does here, it must ascertain the party's true identity to permit the normal operation of judicial processes, including matters such as conflict screening.  *M.I.T.*, 46 F.4th at 77.  That information normally remains under seal and will be used only by court personnel for internal purposes.  Accordingly, plaintiff will be ordered to file a notice of his name and address under seal within 14 days (that is, by November 20, 2024).

## IV.    Conclusion

For the foregoing reasons, plaintiff's motion to proceed under a pseudonym is GRANTED.  Plaintiff is ORDERED to file a notice of his name and address under seal within 14

12

days (that is, by November 20, 2024).

**So Ordered.**

Dated: November 6, 2024

/s/ F. Dennis Saylor IV
F. Dennis Saylor IV
Chief Judge, United States District Court